505 F.2d 238
 Barbara Jean BERRY et al., Plaintiffs-Appellees-Cross-Appellants,
v.
SCHOOL DISTRICT OF the CITY OF BENTON HARBOR, MICHIGAN, et.
al., Defendants-Appellants-Cross-Appellees.
 Nos. 71-1957 and 71-1958.
 United States Court of Appeals, Sixth Circuit.
 Nov. 1, 1974.
 
 Robert P. Small, Small, Shaffer & Small, Benton Harbor, Mich., for defendant-appellant-cross-appellee.
 Stuart J. Dunnings, Jr., Dunnings & Gibson, Lansing, Mich., Louis R. Lucas, Ratner, Sugarmon & Lucas, Memphis, Tenn., Nathaniel R. Jones, New York City, for plaintiffs-appellees-cross-appellants.
 Before PHILLIPS, Chief Judge and EDWARDS and PECK, Circuit Judges.
 PECK, Circuit Judge.
 
 
 1
 Plaintiffs instituted this desegregation action against the School District of the City of Benton Harbor, Michigan, members of the local school board and the district's chief administrative officer in 1967, alleging unconstitutional segregation and inferior educational opportunities for black students. The case was tried before the late Judge W. Wallace Kent, Western District, Michigan, in February 1970. In the findings of fact and conclusions of law announced in July 1971 the court found that although a racial imbalance existed in the school district, defendants had not created it and had no affirmative legal duty to adopt a system wide remedial plan. The court, however, did find defendants guilty of discrimination in three areas: (1) assignment of teaching positions; (2) use of different systems to establish learning groups at three junior high schools; and (3) budgeting for operational expenses on a per-pupil basis. The court ordered defendants to discontinue discriminatory practices in the above areas. Defendants perfected this appeal from the above findings and from the orders to desist, and plaintiffs perfected a cross-appeal claiming that the court erred in not finding de jure segregation and in not providing adequate remedies for the discrimination it found.
 
 
 2
 Defendant school district was formed in 1965 by a process of consolidation, annexation and attachment of separate school districts in and around Benton Harbor. It encompasses an area of 57 square miles, and in 1969[1] it enrolled approximately 12,000 students in 28 regular schools. The professional staff consisted of 470 teachers and 50 administrators. At the time of consolidation the school board adopted the existing attendance area boundary lines of the predecessor districts, the result of which was that by 1970, seven of the 28 schools were more than 80% Black and 14 more than 80% White. Only 7 of 28 schools could be termed mixed. The overall student population was approximately 49% Black and 51% White. Both before and after consolidation, however, all area students attended Benton Harbor High School, which during the 1969-1970 school year was 40% Black and 60% White.
 
 
 3
 The district court attributed pupil population in the schools in the consolidated district to 'the racial complexion of the area served by the individual schools.' It also pointed out that the number and density of the black population had increased between 1965 and 1970, and that with few exceptions the predominately black neighborhoods contained less than adequate housing. Although defendants were not held responsible for the segregated housing patterns, the court stated that the 'containment of blacks (caused) the percentage of students attending schools with a student body of fifty percent or more of the same race (to increase).' The defendants made no effort to alter attendance boundaries to achieve a better racial balance.
 
 
 4
 In 1970 there were approximately 470 teachers in the district, 83 (17.7%) of whom were black. Black teachers were actively recruited by the school district and the years 1965 through 1970 saw a steady improvement in the percentage of black teachers employed. But the district court found that the method used to assign the teachers was racially motivated and that a disproportionate number of black and generally inexperienced teachers were assigned to predominantly black schools resulting in a denial of equal educational opportunity to black students. Nearly 70% Of the black elementary and junior high teachers were assigned to predominantly black schools, while 15 schools had 100% White faculties. The district court ordered defendants to desist from assigning teachers on the basis of race.
 
 
 5
 The court also found that the physical conditions in a number of the schools turned over to the consolidated district in 1965 were grossly inadequate and that all of the buildings operated by the district were generally crowded.[2] It further noted that the median age for predominantly black schools was 43 years, while the median age for predominantly white schools was 17 years. In spite of a well recognized need for improved facilities, no new construction or substantial remodeling was undertaken in the elementary or junior high schools after consolidation due to lack of funds.[3] The court ascribed the differences among the various schools to different types of land and economic development and wide variances in assessed valuation for taxes in the predecessor districts.
 
 
 6
 Defendants operated three separate schools for junior high level students; Fairplain Junior High School (predominantly white), Hull School (mixed), and Benton Harbor Junior High School (predominantly black). Two different methods were used to establish learning groups in the three units and this led the district court to the following conclusion:
 
 
 7
 'The tracking system as used at Benton Harbor Junior High School as differentiated from that used at Fairplain Junior High School and Hull Junior High School, results in a denial of equal opportunity to the students at Benton Harbor Junior High School to achieve the same level of education in junior high school and high school as is afforded to the students at Fairplain Junior High School and at Hull Junior High School. This system is improper and denies equal opportunity to the children who are attending Benton Harbor Junior High School.'
 
 
 8
 The court ordered the tracking system used at Benton Harbor Junior High School discontinued.
 
 
 9
 The district court received extensive evidence regarding the district's budgeting procedures. It found that the budgeting of funds for operational expenses was done on a per-pupil basis and that as a result predominantly white schools which were generally in good condition were able to maintain that status while the older and more dilapidated facilities in predominantly black schools were not upgraded due to lack of funds. Defendants were ordered to revise this budgeting procedure.
 
 
 10
 A thorough review of the record convinces us that the district court's findings that defendants were guilty of discrimination in the assignment of teachers and in the use of two different methods of establishing learning groups in the junior high schools were supported by the evidence. However, it is clear that the district court erred in finding discrimination in the budgeting procedures.
 
 
 11
 The district court made the following finding of fact:
 
 
 12
 'The budgeting of funds is done by the Defendant on a per-student basis, as a result of which many of the schools with majority white students which came into the consolidated district with good facilities are in a position to maintain good facilities, and those schools which came into the consolidated district without good facilities do not have sufficient funds to improve the situation. The budgeting provides for $10.00 per child for operational expense.'
 
 
 13
 The Superintendent explained that the per-student allocation was used only for 'instructional supplies, library and office supplies.' Teachers' salaries, maintenance and repairs, and capital expenditures all came from different and separate funds.
 
 
 14
 The conclusion reached by the district court was apparently based upon the erroneous assumption that the allocation of $10.00 per-pupil per year for operational expenses was spent to maintain the school buildings, or could have been spent to upgrade some of the older facilities. The only evidence of record, however, was that new construction, renovation, and regular maintenance had nothing to do with the operating budget. Thus we must conclude that the district court was clearly erroneous in finding defendants guilty of discrimination in this regard.
 
 
 15
 It is clear from a recital of the facts of record in this case that a number of important indicia of de jure segregation were present even though a dual school system was neither compelled nor authorized by law. The school system was in fact racially imbalanced, teachers were assigned on the basis of race, the physical condition of the predominantly black schools was generally inferior to the conditions in the predominantly white schools, and the method of assigning students to learning groups in the black junior high school deprived black students of an equal opportunity for an education. The Supreme Court has stated that discrimination in these areas of education constitutes a prima facie case of the existence of a dual school system. Keyes v. School District No. 1, Denver, Colorado, 413 U.S. 189, 201, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973); Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 18, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).[4] We are satisfied that a prima facie case was made out in this instance.
 
 
 16
 We recognize the difficulty in determining the quantum of state participation which is a prerequisite to a finding of a constitutional violation. 'The necessary degree of state involvement is incapable of precise definition and must be defined on a case-by-case basis.' United States v. Texas Education Agency, 467 F.2d 848, 864 (5th Cir. 1972), cited with approval in Keyes v. School District No. 1, Denver, Colorado, supra, 413 U.S. at 215, 93 S.Ct. 2686 (Douglas, J., concurring). The district courts are not without guidance in this difficult task, however, as there have been a number of appellate decisions addressed to this problem. Although the relevant standards have not changed since Judge Kent rendered his decision in 1971, the Supreme Court has attempted to clarify the law in this area. For this reason, the issues presented by this case are particularly well suited to fresh consideration by the district court in light of recent case law. The question on remand will be whether defendants can successfully negate the prima facie case of de jure segregation that has been made against them.
 
 
 17
 Plaintiffs ask that we hold defendants' 1965 adoption of the previously existing school attendance boundaries an independent act of deliberate segregation sufficient in itself to warrant an order for 'all-out' desegregation. We decline to do so.
 
 
 18
 The instant suit was commenced after consolidation and no court action was pending against the school district prior to that time. There had been no judicial finding that defendants were operating a dual school system and the defendants had made no determination that action ought to be taken. Further, the attendance lines had existed in substantially the same form for a number of years prior to consolidation and before any complaint of segregation. In light of the above, we cannot say as a matter of law that defendants were under a duty to alter the attendance lines in 1965. Defendants' decision, however, not to adopt new attendance boundaries in the face of a readily discernable patern of residential segregation may be considered part of the cumulative evidence of a possible constitutional violation.
 
 
 19
 We note in passing that the district court stated that except for the specific areas in which it found discrimination 'there (was) no evidence that race (had) been the sole consideration in any act, decision, assignment, choice or program of Defendant District or its Board.' It is not necessary to prove discriminatory motive, purpose, or intent as a prerequisite to establishing an equal protection violation when discriminatory effect has been demonstrated. The 'sole criterion' test has been rejected by the Supreme Court. Wright v. Council of City of Emporia, 407 U.S. 451, 461-462, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1971); see United States v. Texas Education Agency,supra; Mahaley v. Cuyahoga Metropolitan Housing Authority, 355 F.Supp. 1245 (N.D.Ohio 1973). The question to be considered by the district court is whether defendants' official acts resulted in a constitutionally impermissible dual school system.
 
 
 20
 For the reasons set forth hereinabove, the findings of the district court are affirmed in part and reversed in part and the orders entered pursuant thereto are vacated, and the cause is remanded to the district court for further proceedings consistent with this opinion.
 
 
 
 [1]
 The latest statistics of record are for the 1969-1970 school year
 
 
 [2]
 The predominantly black schools operated at 103.6% Capacity; the predominantly white schools operated at 96% Capacity
 
 
 [3]
 All building programs proposed by the school board were defeated by district voters
 
 
 [4]
 The six criteria most often listed as indicia are composition of the student bodies, faculty, staff, transportation, extra-curricular activities, and facilities