**Barbara Jean BERRY, et al., Plaintiffs-Appellants,**

v.

**SCHOOL DISTRICT OF the CITY OF BENTON HARBOR, et al., Defendants-Appellees.**

**William G. Milliken, Governor of the State of Michigan, et al., Defendants-Appellants.**

**Nos. 81–1391 to 81–1396.**

United States Court of Appeals, Sixth Circuit.

Argued June 21, 1982.

Decided Jan. 24, 1983.

Thomas I. Atkins (argued), Michael H. Sussman, Teresa Demchak, Brooklyn, N.Y., for Barbara Jean Berry, et al.; Duane Elston, Detroit, Mich., on brief.

John D. Tully (argued), Warner, Norcross & Judd, Grand Rapids, Mich., for School Dist. of the City of Benton Harbor, et al.; Joseph G. Scoville, Grand Rapids, Mich., on brief.

Robert A. Derengoski, Sol. Gen., James E. Riley, Asst. Atty. Gen. (argued), Lansing, Mich., for William G. Milliken, Governor of the State of Mich., et al.; Frank J. Kelley, Atty. Gen., on brief.

E. Michael Stafford, Lansing, Mich., for Coloma Community Schools.

Lee Boothby, Berrien Springs, Mich., for Zelma Fellner, et al.

Francis A. Jones, III (argued), Hartwig, Crow, Jones & Postelli, St. Joseph, Mich., for Eau Claire School Dist.

Thomas J. Nordberg (argued), Thrun, Maatsch & Nordberg, Lansing, Mich., for Berrien County Intermediate School Dist.

Before EDWARDS, Chief Judge, and PHILLIPS and PECK, Senior Circuit Judges.

GEORGE CLIFTON EDWARDS, Jr., Chief Judge.

This case has presented in one form or another almost all of the issues which are possible in a school desegregation case. This action was initiated in November, 1967. It was first heard before District Judge W. Wallace Kent, and later heard by District Judge Noel Fox and was still later heard by District Judge Douglas Hillman.[1] The protracted history of this case is recorded in the following opinions of the District Court *Berry v. School District of City of Benton Harbor,* 515 F.Supp. 344 (W.D.Mich. 1981), 494 F.Supp. 118 (W.D.Mich.1980), 467 F.Supp. 721 (W.D.Mich.1978), 442 F.Supp. 1280 (W.D.Mich.1977), and an opinion from a prior appeal to this court, *Berry v. School*

1. Judge Kent became a member of the U.S. Court of Appeals for the Sixth Circuit on December 18, 1970. Judge Fox succeeded him and presided over this case for over nine years.

Judge Fox was replaced by Judge Hillman by order on June 19, 1980 due to the former's illness.

*District of Benton Harbor,* 505 F.2d 238 (6th Cir.1974).

In its original form plaintiffs were representatives of families of black students presenting complaints of racial segregation in a newly consolidated school system which encompassed the largely black city of Benton Harbor and fifteen neighboring and previously separate school districts which were semi rural or rural in nature and largely white in school population. Subsequent to consolidation, two other independent districts were joined to Benton Harbor Area School District (BHASD), one by annexation (Eaman) and the other by attachment (Martindale).

When this case was heard before Judge Kent he concluded that a number of practices by the then defendant School District of the City of Benton Harbor were racially discriminatory. But he also held that they did not result in de jure segregation as he interpreted it at that time. This court affirmed his finding pertaining to discriminatory practices in *Berry v. School District of the City of Benton Harbor,* 505 F.2d 238 (6th Cir.1974).

In the opinion of this court, however, we found a number of important indicia of intentional, de jure segregation:

> The school system was in fact racially imbalanced, teachers were assigned on the basis of race, the physical condition of the predominantly black schools was generally inferior to the conditions in the predominantly white schools, and the method of assigning students to learning groups in the black junior high school deprived black students of an equal opportunity for an education. The Supreme Court has stated that discrimination in these areas of education constitutes a prima facie case of the existence of a dual school system. *Keyes v. School District No. 1, Denver Colorado,* 413 U.S. 189, 201, 93 S.Ct. 2686, [2694] 37 L.Ed.2d 548 (1973); *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 18, 91 S.Ct. 1267, [1277] 28 L.Ed.2d 554 (1971); *Green v. County School Board,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716

(1968). We are satisfied that a prima facie case was made out in this instance. 505 F.2d at 242.

The case was then remanded for reconsideration of the District Court's failure to deal with "official acts [which] resulted in the constitutionally impermissible dual school system." Meantime, of course, new legal standards have emerged. *See Bradley v. Milliken,* 484 F.2d 215 (6th Cir.1973) (en banc), *rev'd,* 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974), so as to prohibit on the facts of that case consideration of a desegregation plan crossing district lines. *Dayton Board of Education v. Brinkman,* 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977); *Columbus Board of Education v. Penick,* 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979) and *Dayton Board of Education v. Brinkman (Dayton II),* 443 U.S. 526, 537, 99 S.Ct. 2971, 2979, 61 L.Ed.2d 720 (1979) have made plain that proof of segregative intent on the part of the party against whom a remedy was ordered was required to establish a constitutional violation. They also held that the remedy for any violation found must be an appropriate response for the impact of the violation concerned.

Subsequent to Judge Kent's first trial and this court's remand, plaintiffs added two new contentions concerning liability and four new defendants. These defendants were the adjoining Coloma and Eau Claire School Districts, the Berrien County Intermediate School District, and the Michigan Board of Education. The contentions concerned the Eaman and Sodus area of the Benton Harbor School District. Residents of the Eaman area wanted their children to transfer from the Benton Harbor Area School District to the adjacent Coloma School District and the Sodus residents wanted transfers from the BHASD to the Eau Claire School District. The Sodus transfer to Eau Claire petition was approved after it was revised to exclude a substantial number of black children. The State Board of Education (SBE) eventually approved of both transfers. The Eau Claire transfer decision was, however, enjoined by

the District Court and this action was upheld by this court. These transfers would have deprived the Benton Harbor Area School District of approximately 150 white students in each instance thereby adding to the racial identifiability of the Benton Harbor School District. The record also indicates that both Eau Claire and Coloma allowed some additional tuition transfers.

On a record written before Judge Fox before his illness (subsequently reviewed by Judge Hillman), both Judge Fox and his successor, Judge Hillman, have now found that defendants Benton Harbor Area School District and the School Districts of Eau Claire and Coloma, as well as Benton Harbor Intermediate School District and the SBE, have intentionally committed additional discriminatory acts which account, at least in part, for present racially segregated conditions in the Benton Harbor Schools.

The key issue as we see this appeal is the nature of the remedy ordered by the District Judges; the remedial order appealed from (in which both judges agreed) would 1) return the Sodus II area and its 200 pupils and its four room school house to the Benton Harbor School District; and 2) leave the Eaman area remaining in Benton Harbor Area School District.

The two District Judges disagreed, however, on a significant aspect of remedy. Judge Fox had concluded that the discriminatory practices that he had found on the part of all defendants were such as to warrant relief in terms of an interdistrict remedy merging the Benton Harbor, Eau Claire and Coloma school districts. Judge Hillman, reviewing the record written before Judge Fox, agreed with his liability findings as to all defendants but parted company with him in relation to ordering a mandatory interdistrict remedy which would merge the three districts.

Judge Hillman found specifically:

Interdistrict violations with interdistrict effects of sufficient seriousness have been established in this record on liability to warrant interdistrict involvement in a remedy under this test. The actions of Coloma and Eau Claire not only contributed to segregation, they also contributed to disruption within the Benton Harbor District which rendered school officials unable to solve the racial and educational problems facing the district. Coloma's contribution to these problems, if measurable and if measured, would certainly be perceived as being greater than any incremental contribution made by Eau Claire school officials. The effect of any racially inspired conduct on the part of Eau Claire by school officials is diminished by the fact that the Sodus II property transfer was never completed. The successful Eamon transfer had a much more grave effect on the events that followed it than the aborted Sodus II transfer. This disparity in incremental contributions, however, exists not because of any different degree of racially inspired conduct in the two school districts, but because the Sodus II transfer was enjoined by this court.

Both districts participated in racially motivated planning that in one instance did and in the other would have, created opportunities for white property owners and students to abandoned [sic] the fragmenting iceberg. Violations by both school districts have had a clear, interdistrict effect. These constitutional wrongs call for an interdistrict remedy, but something less than consolidation of these three districts and less than complete desegregation in each district.

*Berry,* 515 F.Supp. at 353–54.

We recognize that defendants Eau Claire, Coloma, Benton Harbor Intermediate School District and the Michigan State Board of Education all dispute the two District Judges' findings of liability based upon the findings of racially discriminatory intent. We have reviewed the lengthy opinions of the two District Judges on these two issues as to all defendants and conclude that we cannot hold their findings of fact to have been clearly erroneous or that their conclusions of law were violative of federal constitutional principles as exemplified by the opinions of the Supreme Court of the

United States. In thus dealing with the issue of liability, we rely upon and adopt the opinions of Judge Fox dated August 22, 1977 entitled *Berry v. School District of the City of Benton Harbor,* 442 F.Supp. 1280 (W.D.Mich.1977) and *Berry v. School District of the City of Benton Harbor,* 467 F.Supp. 721 (1978) and those of Judge Hillman dated June 19, 1980 in *Berry v. School District of City of Benton Harbor,* 494 F.Supp. 118 (W.D.Mich.1980) and *Berry v. School District of the City of Benton Harbor,* 515 F.Supp. 344 (W.D.Mich.1981).

■ In spite of the many arguments which are presented by the various appellants, we believe that the only argument of merit which should concern this court is that which bears directly upon the appropriateness of an interdistrict remedy. Judge Fox clearly considered the violations he found on the part of the SBE, the Benton Harbor Intermediate School District, and the School Districts of Eau Claire and Coloma to be sufficient not only to support his findings of intentional racial discrimination and segregative action but also to be of sufficient impact to support interdistrict remedies. Judge Hillman's review of Supreme Court precedent dealing with remedy led him to take a different view. In relation to the one area, the Eaman area, which had been transferred to the Coloma School District, along with its elementary school, he ordered that retransfer of the elementary school to BHASD be accomplished without any financial liability falling on the Benton Harbor District. He also permanently enjoined the transfer of the Sodus II area out of the Benton Harbor School District to the Eau Claire School District or any other school district. Further, he enjoined both the Coloma and the Eau Claire School Districts from receiving transfers of students from the Benton Harbor School District "except under the terms and conditions included in the interdistrict transfer aspects of this court's desegregation plan." These are remedial actions directly related to the remedying of the specific intentional segregative acts caused by the defendants as shown in this record. Those aspects of Judge Hillman's remedial order are therefore fully affirmed.

■ We turn now to consideration of the Berry plaintiffs and the School District of Benton Harbor's appeals claiming that Judge Hillman erred as a matter of law in failing to order a mandatory interdistrict desegregation plan under the circumstances of this case. Appellant Benton Harbor claims that Judge Hillman's denial of interdistrict relief was founded upon Judge Hillman's lack of acquaintance with the area concerned and improper weight which he allegedly gave to the "unpopularity of busing" and "a strong desire to maintain autonomous local school districts." We do not find support in this record that Judge Hillman ignored any local conditions which would support a different conclusion than that at which he arrived. This circuit has repeatedly followed the mandates of the Supreme Court for desegregation of school systems including in such desegregation plans the mandatory use of busing where essential to the success of the desegregation plan. *Penick v. Columbus Board of Education,* 583 F.2d 787 (6th Cir.1978), aff'd, 443 U.S. 449, 99 S.Ct. 2982, 61 L.Ed.2d 666 (1979); *Brinkman v. Gilligan,* 583 F.2d 243, aff'd, *Dayton Board of Education v. Brinkman,* 443 U.S. 526, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979); *Reed v. Rhodes,* 607 F.2d 714 (6th Cir.1979), cert. denied, 455 U.S. 1018, 102 S.Ct. 1713, 72 L.Ed.2d 135 (1982); *Kelley v. Nashville-Davidson County Board of Education,* 479 F.2d 810 (6th Cir. 1973). As to maintenance of autonomous local school districts, this circuit has never viewed such an objective as constitutionally sacrosanct. This is particularly true in the State of Michigan where the SBE has always had absolute power to change or alter school district boundaries and to abolish and consolidate whole school districts with or without the agreement of the local boards of educations and their constituents.

Our affirmance of Judge Hillman in his rejection of an interdistrict remedy is based directly upon the fact that school desegregation case law in the Supreme Court limits this remedy to situations where the race

discrimination and intentional segregative practices are such as to have been a substantial cause of the condition which requires interdistrict solution.

This record simply does not support the proposition that the activities of white parents in their Sodus I and Sodus II efforts to join the school district of Eau Claire and the successful activities of the white parents of the Eaman area to join the Coloma School District occasioned the massive long pre-existing problems of racial discrimination and racial isolation within the School District of Benton Harbor. This is of course particularly true since prompt legal action prevented the transfer of the Sodus area from ever taking place, although the transfer of approximately 150 white students from the Eaman area of the Benton Harbor School District to Coloma did occur.[2] The actual impact of the transfers upon the black-white ratio of Benton Harbor School District was less than 1 percent.

We have of course considered appellant Benton Harbor's argument that the psychological impact of the "white flight" motive involved in both these efforts was far more serious in its psychological effect upon Benton Harbor than the numerical impact of the transfer would have indicated. In weighing this issue, we turn to Supreme Court precedent which deals directly with interdistrict transfers and consolidations.

In one of the first cases to deal with remedy in its relationship to intentional segregative acts, Chief Justice Burger enunciated for the court the general principle which runs through all remedy cases:

School authorities are traditionally charged with broad power to formulate and implement educational policy and might well conclude, for example, that in order to prepare students to live in a pluralistic society each school should have a prescribed ratio of Negro to white students reflecting the proportion for the

district as a whole. To do this as an educational policy is within the broad discretionary powers of school authorities; absent a finding of a constitutional violation, however, that would not be within the authority of a federal court. *As with any equity case, the nature of the violation determines the scope of the remedy.* In default by the school authorities of their obligation to proffer acceptable remedies, a district court has broad power to fashion a remedy that will assure a unitary school system. (Emphasis added)

*Swann*, 402 U.S. at 16, 91 S.Ct. at 1276.

This principle was carried further by the same author in a case which considered an interdistrict remedy in the instance of the Board of Education of the City of Detroit:

The controlling principle consistently expounded in our holdings is that the scope of the remedy is determined by the nature and extent of the constitutional violation. *Swann*, 402 U.S. at 16 [, 1276]. Before the boundaries of separate and autonomous school districts may be set aside by consolidating the separate units for remedial purposes or by imposing a cross-district remedy, it must first be shown that there has been a constitutional violation within one district that produces a significant segregative effect in another district. *Specifically, it must be shown that racially discriminatory acts of the state or local school districts, or of a single school district have been a substantial cause of interdistrict segregation.* Thus an interdistrict remedy might be in order where the racially discriminatory acts of one or more school districts caused racial segregation in an adjacent district, or where district lines have been deliberately drawn on the basis of race. In such circumstances an interdistrict remedy would be appropriate to eliminate the interdistrict segregation directly caused by the constitutional violation. Conversely, without an interdistrict violation

2. In 1960 Benton Harbor had a population of 19,000, 70 percent of which was white. At the time this case was heard, it had a population of 15,000 of which 20 percent was white. Black students made up 37 percent of the district

school population in 1966 and at the time the District Court was dealing with this, black students made up 77 percent of the district's 9,100 students.

and interdistrict effect, there is no constitutional wrong calling for an interdistrict remedy. (Emphasis added).

*Milliken,* 418 U.S. at 744–45, 94 S.Ct. at 3127.

In *Dayton II, supra,* the majority opinion by Justice Rehnquist further spelled out the necessity of finding not only intentional discriminatory actions on the part of a defendant school board but relating them directly to redress only those segregative effects which had been caused by the intentional segregative acts:

> The duty of both the District Court and the Court of Appeals in a case such as this, where mandatory segregation by law of the races in the schools has long since ceased, is to first determine whether there was any action in the conduct of the business of the School Board which are intended to, and did in fact, discriminate against minority pupils, teachers, or staff. *Washington v. Davis,* [426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597] *supra.* All parties should be free to introduce such additional testimony and other evidence as the District Court may deem appropriate. *If such violations are found, the District Court in the first instance, subject to review by the Court of Appeals, must determine how much incremental segregative effect these violations had on the racial distribution of the Dayton School population as presently constituted, when that distribution is compared to what it would have been in the absence of such constitutional violations. The remedy must be designed to redress that difference, and only if there has been a systemwide impact may there be a systemwide remedy. Keyes,* 413 U.S. at 213 [93 S.Ct. at 2699]. (Emphasis added).

*Dayton Board of Education,* 433 U.S. at 420, 97 S.Ct. at 2775.

Our review of this long record against the legal standards emphasized above does not allow us to reverse Judge Hillman in his holding that the discriminatory acts he found on the part of school boards of Eau Claire and Coloma and on the part of the Benton Harbor Interdistrict School Board and the Michigan SBE did not warrant a wiping out of school district lines and a merger of the three school districts.

A long look back at the history of this litigation discloses that the Benton Harbor schools were identifiably black long before the Benton Harbor Area School District was formed. In addition, the original charges of racial discrimination which were made by black parents in the Benton Harbor Area School District and found valid by Judge Fox were based upon actions taken by that School Board in discriminatory assignment of teachers, and discriminatory assignment of pupils. It is against this background which was clearly not produced by either the Sodus or the Eaman transfers that we must consider the numerical or psychological impact of the four defendants' actions in approving the two transfers. Thus viewed, it is hard indeed to fault Judge Hillman in finding that the only interdistrict boundary change warranted by the discriminatory acts proven before him was that of ordering return of the Eaman area to the Benton Harbor Area School District. On this record we conclude that we cannot do so.

█ We now turn to the last issue in this case. Judge Hillman clearly was not (nor are we) satisfied with the relative ineffectiveness of the remedy we have just discussed and affirmed. His opinion continues for many pages to discuss the development of a desegregation plan between the Benton Harbor School system and the school systems of Coloma and Eau Claire. He describes this as a "voluntary" desegregation plan contemplating the construction of "magnet schools." We have no doubt that this sort of planning could be engaged in by the three school districts concerned with the approval and cooperation of the SBE and the Benton Harbor Interdistrict School District. To the degree that Judge Hillman's opinion in this regard represents a series of suggestions to the local and state authorities concerned, we have no hesitation in endorsing them. We point out, however, that they are not enforceable orders and that the only agency before this court with

power to require the measures which Judge Hillman talks about in the building of these magnet schools is the Michigan SBE as a result of the broad powers given it in the 1963 Constitution of the State of Michigan. That Constitution provides: "Article I, Section 2. No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin." Article VIII, section 2, states that "[e]very school district *shall* provide for the education of its pupils *without* discrimination as to religion, creed, race, *color* or national origin." Article VIII, section 3, of the Michigan Constitution gives the SBE "leadership and general supervision over *all public education,*" and further provides that the SBE "*shall* serve as the general planning and coordinating body for all public education." (Emphasis supplied.) Mich.Comp.Laws Ann. § 380.1281 (1977) reinforces the State Board's duty to enforce the laws against discrimination in education by stating that "SBE *shall* require each board, and intermediate school board, and the officers thereof to observe the laws relating to school." With these state law powers, the Michigan SBE could, of course, be of great assistance to the District Court assuming he was able to gain the active cooperation of that body.

On remand of this case to the District Court after completion of appellate review, the District Judge might, however, meet continued obdurate opposition to his voluntary desegregation plan from some or all four of the added defendants. If so he may then consider whether or not such conduct represents additional violations with additional "incremental segregative effect," which might warrant consideration of orders of a mandatory nature to effectuate his desegregation plan. *See Dayton Board of Education,* 433 U.S. at 420, 97 S.Ct. at 2775.

AFFIRMED AND REMANDED.

PECK, Senior Circuit Judge, concurring.

While I am in entire accord with the holding expressed in the majority opinion, I have reservations concerning the inclusion therein of the final two paragraphs. Apart from their apparent inconsistency with the balance of the opinion, they seem to me to be advisory in nature and while I have no quarrel with the sentiments expressed in the two questioned paragraphs, I would prefer to let decision in the circumstances hypothesized await the day of their presentation.