Barbara Jean **BERRY, et al.,** Plaintiffs,

v.

**SCHOOL DISTRICT OF the CITY OF BENTON HARBOR, et al.,** Defendants.

**Civ. A. No. 9.**

United States District Court, W.D. Michigan, S.D.

May 13, 1983.

James E. Riley, Asst. Atty. Gen., Lansing, Mich., for State of Mich.

Michael W. Sussman, Gen. Counsel, NAACP Sp. Contribution Fund, Brooklyn, N.Y., Duane Elston, Detroit, Mich., for plaintiffs.

Thomas J. Nordberg, Thrun, Maatsch & Nordberg, P.C., Lansing, Mich., for Berrien Co. Inter. School Dist.

Arthur Przybylowicz, Foster, Swift, Collins & Coey, Lansing, Mich., for MEA.

John D. Tully, Warner, Norcross & Judd, Grand Rapids, Mich., for City of Benton Harbor.

E. Michael Stafford, Farhat, Burns & Story, P.C., Lansing, Mich., for Coloma Bd. of Educ.

Francis A. Jones, III, John L. Crow, Hartwig, Crow, Jones & Postelli, St. Joseph, Mich., for Eau Claire Bd. of Educ.

## SUPPLEMENTAL OPINION AND ORDER

HILLMAN, District Judge.

This case is currently before the court pursuant to various motions made by the parties, as well as other matters which have been held in abeyance while this case was before the Court of Appeals for the Sixth Circuit. On January 24, 1983, the Court of

Appeals rendered its decision in this case, *Berry v. School District of City of Benton Harbor,* 698 F.2d 813 (6th Cir.1983), as clarified. I will now address those outstanding matters which presently are before this court.

## I. STATE OF MICHIGAN'S ⁀ MOTION TO VACATE

State defendants Milliken, et al. (the State) have moved this court to vacate portions of its May 1, 1981, Decision and Remedial Order, 515 F.Supp. 344 (W.D.Mich. 1981), and various supplemental orders entered by this court. The matter has been briefed by the parties and oral argument was held on May 11, 1983. The State of Michigan has moved to vacate the following portions of this court's May 1, 1981, Order:

"The defendants, their administrators, officers, staff members and employees are expected to take all steps necessary to accomplish the tasks outlined in the court's opinion of this date, on or before the dates specified in that opinion, and to implement the court's desegregation plan, consistent with the court's opinion.

The State of Michigan is directed to pay the following expenses related to this desegregation plan:

(a) Sixty percent of the fees for consultants used in the magnet programs component of the plan, for the 1981–82 school year and the 1982–83 school year;

(b) transportation costs, according to the existing state transportation reimbursement formula, for students transported across school district lines to participate in the magnet programs and/or interdistrict transfer components of the plan;

(c) for each student who elects to transfer to another school district under the court's plan, the state shall continue to pay the home school district 100% of the state financial aid that the student would have generated had he or she not elected to transfer;

(d) for each interdistrict transfer student, transferring under this plan, the state shall pay to the receiving district 100% of the costs involved in educating that pupil, computed as an amount equal to that district's annual maintenance cost per enrolled student;

(f) fees and expenses of Dr. Michael J. Stolee, acting as the court's representative for the implementation of the desegregation plan;

(g) the state shall reimburse school districts, in at least quarterly increments throughout the school year, for teacher incentive salaries of $1,000 per teacher, paid by the district, for each teacher accepting a temporary cross-district reassignment under this plan; and

(h) the annual budget for the inservice training program, in an amount equal to $100 per employee of the three school districts for the 1981–82 school year and $20 per employee for the 1982–83 and 1983–84 school years. These expenses may be paid in actual money allocations or in inkind services of qualified professionals or a combination of both.

Additionally, the State has moved to vacate this court's orders of May 26, 1982 and October 28, 1982. These orders required the State to reimburse 66⅔% of desegregation transportation costs incurred by defendant school districts in implementing this court's May 1, 1981, desegregation plan.

The basis of the State's motion stems from a portion of the Sixth Circuit's opinion affirming this court's May 1, 1981, opinion and remedial plan. That portion of the Court of Appeals opinion reads as follows:

We now turn to the last issue in this case. Judge Hillman clearly was not (nor are we) satisfied with the relative ineffectiveness of the remedy we have just discussed and affirmed. His opinion continues for many pages to discuss the development of a desegregation plan between the Benton Harbor School system and the school systems of Coloma and Eau Claire. He describes this as a 'voluntary' desegregation plan contemplating the construction of 'magnet schools.' We have no doubt that this sort of planning could be engaged in by the three school districts concerned with the approval and

cooperation of the SBE and the Benton Harbor Interdistrict School District. To the degree that Judge Hillman's opinion in this regard represents a series of suggestions to the local and state authorities concerned, we have no hesitation in endorsing them. We point out, however, that they are not enforceable orders and that the only agency before this court with power to require the measures which Judge Hillman talks about in the building of these magnet schools is the Michigan SBE as a result of the broad powers given it in the 1963 Constitution of the State of Michigan. That Constitution provides: 'Article I, Section 2. No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin.' Article VIII, section 2, states that '[e]very school district *shall* provide for the education of its pupils *without* discrimination as to religion, creed, race, *color* or national origin.' Article VIII, section 3, of the Michigan Constitution gives the SBE 'leadership and general supervision over *all public education,*' and further provides that the SBE 'shall serve as the general planning and coordinating body for all public education.' (Emphasis supplied.) Mich. Comp.Laws Ann. § 380.1281 (1977) reinforces the State Board's duty to enforce the laws against discrimination in education by stating that 'SBE *shall* require each board, and intermediate school board, and the officers thereof to observe the laws relating to the school.' With these state law powers, the Michigan SBE could, of course, be of great assistance to the District Court assuming he was able to gain the active cooperation of that body.

On remand of this case to the District Court after completion of appellate review, the District Judge might, however, meet obdurate opposition to his voluntary desegregation plan from some or all four of the added defendants. If so he may then consider whether or not such con-

duct represents additional violations with additional 'incremental segregative effect,' which might warrant consideration of orders of a mandatory nature to effectuate his desegregation plan. *See Dayton Board of Education, [v. Brinkman],* 433 U.S. [406] at 420, 97 S.Ct. [2766] at 2775 [53 L.Ed.2d 851]."

698 F.2d at 820.

The State contends, based on the above language, that certain orders from this court involving State defendants in interdistrict desegregation efforts are invalid. The State alleges that the interdistrict constitutional violations of the State defendants found by this court and affirmed by the Court of Appeals were not, however, according to the January 24, 1983, Court of Appeals opinion, severe enough to warrant any interdistrict relief. In addition to the language in the Court of Appeals opinion, the State claims some additional support for its present motion from the Court of Appeals' April 29, 1983, clarification of its January 24, 1983 opinion. That clarification, which was sought by the State, making the same arguments as it currently does, reads as follows:

"This court has received and considered certain motions for 'clarification' and rehearing of its opinion dated January 24, 1983. We have determined from the briefs filed by the parties that said opinion is being interpreted and followed by the parties in accordance with both its purport and its language . . . ."

Counsel has provided the court with a copy of the Sixth Circuit's clarification opinion as well as the briefs submitted to the Appellate Court in that matter. Generally, of course, those briefs are not made available to the district judge. Not surprisingly, those briefs continue to reflect the parties' diametrically opposed positions that have characterized the long history of this case. Based on my study and review of the Sixth Circuit's January 24, 1983, opinion and the April 19 clarification, the State's motion to vacate this court's previous orders is denied.

## A. THE STATE'S LIABILITY

In bringing the present motion, the State contends that as it interprets the January 24th Court of Appeals' Opinion, that Court, in effect, held the State's interdistrict unconstitutional acts did not sufficiently cause segregated conditions in the Benton Harbor area to warrant any interdistrict relief.

In my judgment neither the facts of this case nor a common sense reading of the Court of Appeals' Opinion warrant such an interpretation. Although the facts surrounding this case have been extensively documented in various opinions, I find that the instant motion requires a brief review of the State's role in this case. *See Berry v. School District of Benton Harbor,* 515 F.Supp. 344 (W.D.Mich.1981); 494 F.Supp. 118 (W.D.Mich.1980); 467 F.Supp. 721 (W.D.Mich.1978); 442 F.Supp. 1280 (W.D. Mich.1977); *and see Berry v. School District of Benton Harbor,* 505 F.2d 238 (6th Cir. 1974).

The State defendants were brought before this court in "Phase II" of this litigation. During that period, then Chief Judge Noel P. Fox specifically found that the State defendants had committed intentional and independent segregative acts in violation of the constitutional rights of the Benton Harbor school children which further segregated a school district already operating under a system of de jure segregation. 467 F.Supp. 630. Some of Judge Fox's finding, which were adopted by this court, 494 F.Supp. 118, and affirmed by the Sixth Circuit, 698 F.2d 813, warrant recitation.

While Phase I of this litigation was pending, the State Board of Education (SBE) approved the transfer of a majority of the former Eamon School District out of the Benton Harbor Area School District (BHASD) and into the Coloma District. This transfer, which deprived BHASD of approximately 150 white students, was approved by the SBE against the recommendation of the Berrien County Intermediate School District (BCISD) and the SBE hearing officer. SBE's action was taken with full knowledge that the proposed transfer would adversely affect racial integration in BHASD and that the proposed transfer was racially motivated. 467 F.Supp. at 641–47.

During the 1970's, defendant Eau Claire School District became a haven for white tuition students who wished to avoid attending school in the increasingly black BHASD. The practice of transferring white students out of Benton Harbor reached its peak in 1977 when 107 Benton Harbor residents transferred to Eau Claire. The SBE was well aware of the number of white students transferring out of Benton Harbor. 467 F.Supp. at 654–55.

In 1974, the SBE approved the Sodus II transfer to Eau Claire. That transfer, had it not been enjoined by this court, would have resulted in an additional loss of 143 students (approximately 100% white) to BHASD. Activities surrounding the Sodus and other proposed transfers were particularly obnoxious. Some BHASD Board members, who initially approved the transfer petition, had obtained their elected positions running on a platform of transferring portions of the district out of Benton Harbor. Judge Fox found, and in my review of the record I reaffirmed his finding, that the Sodus II transfer was racially motivated.

The impact of the two transfers went far beyond raw numbers. In approving transfer of predominantly white areas out of an already segregated school system, the SBE perpetuated notions of racial superiority and in effect sent a message to discontented whites that their difficulties could be solved, with the State's help, by dismantling BHASD.

The effect of the State's conduct was not limited to the overwhelming psychological impact inflicted on Benton Harbor school children. But, because of the Eamon transfer and subsequent transfer petitions, BHASD was unable to provide many educational opportunities to Benton Harbor children. Faced with the possibility of having its district dismembered by State approval, the Benton Harbor school administration was forced to cancel long-range plans to improve the BHASD curriculum. Additionally, future building plans were halted. Moreover, the district was compelled to can-

cel a scheduled bond election for capital improvements. This sorry tale of the State's role in conspiring to create a black, segregated school district within Benton Harbor is detailed in the District Court's earlier opinion reported at 467 F.Supp. 630, 633–658.

Based on these facts, Judge Fox found that the State had violated the rights of Benton Harbor area school children under the United States Constitution and the laws of Michigan. Judge Fox concluded that the constitutional violations occurring in the Benton Harbor area warranted a merger of the Benton Harbor, Eau Claire, and Coloma school districts.

After this case was transferred to my court, I specifically adopted Judge Fox's findings of fact and conclusions of law. 494 F.Supp. 118 (W.D.Mich.1980), aff'd. 698 F.2d 813 (6th Cir.1983). In addition, I specifically found that defendants' conduct had such a significant incremental segregative effect on the existing conditions in Benton Harbor so as to authorize a mandatory interdistrict remedy. 515 F.Supp. at 352, aff'd. 698 F.2d 813. However, after almost an entire month of hearings in Benton Harbor, I concluded that a remedy other than a dismantling of the three school districts was called for. I was convinced that a voluntary desegregation program, carefully planned and supervised with the help of skilled and dedicated existing professional personnel, and with adequate funding, could in the long run bring about a successful, public supported, integrated school system.

At the time the May 1, 1981, remedial order was issued, Benton Harbor's school population of 9,100 was approximately 77% black and 22% white. To remedy the segregative effects caused by the defendants, this court first enjoined defendants from transferring areas out of Benton Harbor. Additionally, I enjoined the acceptance of transfer students "except under the terms and conditions included in the interdistrict transfer aspects of this court's desegregation plan." 515 F.Supp. at 358.

The plan itself evolved around two basic concepts. Black students from Benton Harbor were not only free but encouraged to transfer to either Coloma and Eau Claire. At the same time, two important, new concepts were introduced in Benton Harbor. First, a long-range plan was instituted to upgrade the quality of support for the Benton Harbor schools within the Benton Harbor populace. This so-called Comer Plan is described in detail in the court's May 1 Order (page 370) and apparently not objected to by the State defendants. Second was the voluntary transfer plan itself and the Magnet School Program.

Under the transfer program, the May 1 Order provided that any student of Benton Harbor could elect to transfer to either Coloma or Eau Claire schools. Likewise, any student of Coloma or Eau Claire could elect to transfer to Benton Harbor schools, the only limitation being that the transfer would further the integration of the districts. To ensure that resident districts would encourage voluntary transfers to other districts, this court ordered that the State of Michigan pay to the resident and attending district, 100% of the state aid a given student would have generated had that student stayed in his or her home district.

The key, of course, to encourage Coloma and Eau Claire students was the extent and quality of the magnet school programs to be established in Benton Harbor. With respect to the Magnet School portion of the May 1 Order, the court ordered that the superintendents of BCISD, BHASD, Coloma and Eau Claire School Districts, along with a SBE representative, establish a committee to plan for specialized and unique programs (popularly known as magnet classes) within the Benton Harbor area. The Committee was directed to establish unique educational curricula which would encourage Coloma and Eau Claire students to take advantage of previously denied educational opportunities and thus to participate in the desegregation of Benton Harbor area schools.

The Magnet program portion of the May 1 Order envisioned, generally, that the defendant school districts utilize existing facilities in which to offer magnet programs. Minimally, the May 1 Order required that a three-district vocational, technical and work-study program be established in BHASD. To facilitate the success of the program and students' election to participate in a magnet program, the court ordered that Coloma discontinue its existing interdistrict vocational educational programs. A fundamental aspect of the magnet program was that school district independence remain intact. Equally important, by participating in a magnet program, a high school student was to continue to attend school in his or her resident district. As such, the magnet program, in many ways, merely continued existing interdistrict educational programs, but required that they be carried out on an integrated basis. 515 F.Supp. at 366.

The May 1 remedy called for the limited use of interdistrict transportation in order to facilitate the efficacy of the voluntary desegregation plan. However, the plan did not rely on any set racial quotas in programs or on the extensive use of transportation to achieve integrated schools in the Benton Harbor area. Although the ultimate success of the May 1 plan is exclusively dependent upon the voluntary participation of the school children, the participation and cooperation of the defendants is mandatory. 515 F.Supp. at 356.

## B. THE MAY 1 ORDER AS IMPLEMENTED (TURNER DATA)

Despite some expressed concerns over the effectiveness of the court's May 1 remedy and despite fears in some quarters that the implementation of the May 1 Order would result in violence, the court's voluntary desegregation plan to date has been a startling success. Currently (1982–1983 school year), over 500 Benton Harbor black students have volunteered and participated in the interdistrict transfer program. At the present time, approximately five per cent of the students from Eau Claire are attending BHASD. Although a smaller percentage are participating from Coloma, the magnet program is just now being fully implemented and greater numbers of students from the outlying districts are expected in the current year, as well as the year ahead.

The Magnet School Committee has independently planned and established a number of new vocational and academic programs which promise to provide the needed and desired curricula previously denied to Benton Harbor area school children. New, imaginative and creative courses, now included in the magnet program for elementary students, include, for example, AWARE Writing Program, Gifted and Talented Academy, Creative Arts Academy and Montessori Program. The impact of this program is most clearly borne out by the reports submitted to this court that over 300 Coloma and Eau Claire students have recently participated in Benton Harbor's magnet-programs' visitation day in anticipation of the 1983 fall enrollment. (Report from the Community Education Council.)

Significantly, the court's voluntary desegregation plan has been implemented virtually without incident. William Barrett, Superintendent of Coloma Community Schools, testified before this court on October 12, 1982, that although the first year of the desegregation plan was difficult, the second year, 1982–1983, was going very smoothly. As evidence of this, Mr. Barrett testified that the students were getting along well together; the program was enthusiastically supported by the teaching staff and that a black transfer student from Benton Harbor had just been elected as student body president of the Coloma Middle School. (October 12, 1983 Tr. at 20).

Even more significantly, the Michigan Educational Assessment Program Report for the 1982–1983 school year, copies of which were made available to the Court by the Community Education Council, shows that after an initial decline in test scores, the achievement scores for Coloma residents and Benton Harbor residents attend-

ing school in Coloma have risen dramatically.

These results confirm this court's view that school integration on a voluntary basis can work. Additionally, the achievement data currently available show that while the acts of the defendants historically deprived students of many educational advantages, both white and black students respond quickly and positively when those earlier restraints are ordered removed.

## C.  THE MERITS OF THE STATE'S MOTION

The State's motion to vacate the various orders entered by this court is premised upon its reading of the Sixth Circuit's January 24, 1983, Opinion that the State's unconstitutional conduct did not have a sufficient incremental segregative effect to warrant any interdistrict relief.  In addition, the State contends that the Sixth Circuit's January 24, 1983, Opinion only affirms this court's remedy to the extent that the remedial plan is voluntary.  In this regard, the State asserts that Michigan law does not allow it to "voluntarily" participate in the May 1 remedy.  The State specifically contends that Michigan law does not authorize payment of state aid to both a district of a student's residence and a student's district of attendance as required under the May 1 Order.  Consequently, the State contends that interdistrict remedies involving the State are involuntary and must be vacated. I am satisfied the State defendants have not only misread the January 24th Opinion of the Sixth Circuit, but have misconceived this court's authority to remedy constitutional violations.  The Supreme Court described the federal court's equity powers to fashion an appropriate remedy in *Brown v. Board of Education,* 349 U.S. 294, at 300, 75 S.Ct. 753, at 756, 99 L.Ed. 1083 (1955), saying:

"In fashioning and effectuating the decrees, the courts will be guided by equitable principles.  Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by facility for adjusting and reconciling public needs."

The Supreme Court in desegregation cases has repeatedly emphasized that:

"The task is to correct, by a balancing of the individual and collective interests, 'the condition that offends the Constitution.'  A federal remedial power may be exercised 'only on the basis of a constitutional violation' and, 'as with any equity case, the nature of the violation determines the scope of the remedy.'"

*Milliken v. Bradley,* 418 U.S. 717, 738, 94 S.Ct. 3112, 3124, 41 L.Ed.2d 1069 (1974), quoting *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554.

More recently, the Court has precisely defined the duty of a district court in tailoring a remedy to fit the extent of constitutional violations.

"The duty of both the District Court and the Court of Appeals in a case such as this, where mandatory segregation by law of the races in the schools has long since ceased, is to first determine whether there was any action in the conduct of the business of the School Board which are intended to and did in fact discriminate against minority pupils, teachers, or staff.  All parties should be free to introduce such additional testimony and other evidence as the District Court may deem appropriate.  If such violations are found, the District Court in the first instance, subject to review by the Court of Appeals, must determine how much incremental segregative effect these violations had on the racial distribution of the Dayton School population as presently constituted, when that distribution is compared to what it would have been in the absence of such constitutional violations.  The remedy must be designed to redress that difference, and only if there has been a systemwide impact may there be a systemwide remedy."

*Dayton Board of Education v. Brinkman,* 433 U.S. 406, 422, 97 S.Ct. 2766, 2776, 53 L.Ed.2d 851 (1977) (footnotes and citations omitted.)

■ It was these precise standards by which this court, and Judge Fox, measured the extent of the State's liability, 515 F.Supp. at 353; 467 F.Supp. 630, and found that the State's conduct caused a substantial incremental segregative effect on an interdistrict basis. At the time Judge Fox rendered his "Phase II" Opinion, BHASD had a total enrollment of 10,255 students; 26.9% of whom were white. Given the 150 students that were lost to BHASD due to the Eamon transfer and the 107 transfer students who were currently attending Eau Claire, the State's unconstitutional acts amounted to approximately a 10% reduction in the white school population of BHASD.[1] See 467 F.Supp. at 641, n. 21, and 641, n. 22; with 655 n. 118. This degree of incremental segregative effect attributable to the State could itself warrant the exercise of this court's equitable powers. Cf. Wright v. Council of City of Emporia, 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972) (six percent reduction of white population); United States v. Scotland Neck Board of Education, 407 U.S. 484, 92 S.Ct. 2214, 33 L.Ed.2d 75 (1972) (twelve percent reduction in white population). In addition, as previously described, the State's conduct, in fact, caused BHASD to cancel many long-range educational plans.

■ More important to the present motion, the Sixth Circuit specifically addressed and approved the interdistrict aspects of the May 1 Order. First, the Court of Appeals specifically quoted this court's finding that interdistrict violations with interdistrict effects of sufficient seriousness had been established to warrant interdistrict involvement. 698 F.2d at 816. Thereafter, the Court of Appeals, again quoting this court's holding that interdistrict transfers were enjoined and subsequently would occur under the conditions set forth in the May 1 plan, stated:

"These are remedial actions directly related to remedying of the specific intentional segregative acts caused by the de-

fendants as shown in this record. Those aspects of Judge Hillman's remedial order are therefore fully affirmed."

698 F.2d at 813. Therefore, the Court of Appeals specifically considered and affirmed this court's order as it encompassed interdistrict transfer relief. Consequently, the State's contentions are meritless.

The State contends that the Sixth Circuit held that this court's equity power is limited to the extent the State will voluntarily comply. I am satisfied that the State has totally misconstrued the context and the purport of the Sixth Circuit's holding. First, in ruling that this court's voluntary desegregation plan could become mandatory if met with "obdurate opposition," the Sixth Circuit was addressing plaintiffs'/appellants' argument that defendant's constitutional violations warranted a "mandatory" abolishment of independent school districts. 698 F.2d at 819–820. Since the Court of Appeals concurred that the record did not warrant a mandatory dissolution of independent school districts, the Court found that the remedial plan, as presently constituted, should continue on a voluntary basis. Id. However, nothing in the Sixth Circuit's January 24th Opinion suggests that the State cannot be required by this court to participate in an interdistrict remedy. The pivotal point of the May 1 Order, and the Sixth Circuit's January 24th Opinion, rests on the voluntary participation of the school children; not the voluntary participation of the defendants. Any other interpretation of the last paragraphs of the Sixth Circuit's January 24th Opinion would render those statements entirely inconsistent with its earlier affirmance of the court's voluntary interdistrict transfer program. Id. at 817.

I do not suggest that the January 24th Opinion is not subject to interpretation. In discussing the Magnet School aspect of the May 1 Order, the Sixth Circuit mistakenly interpreted this court's order as requiring

---

**1.** The State minimizes this by arguing that the transfer of 10% of the white students changed by only 1% the total school population. But, in fact, the State defendant's unlawful encourage- ment of removing 10% of the district's already rapidly dwindling white student population had an overwhelming adverse effect in attempting to maintain an integrated district.

the "construction" and "building" of magnet schools. The Court of Appeals found that such wide-range planning was, by state law, committed solely to the State Board of Education. *Id.* at 819–820. Again, I note the Sixth Circuit's statements were made in the context of its concurrence with this court that the record did not warrant the dissolution of independent school districts. Clearly, the court's concern was that expansive "building" and "construction" of schools was tantamount to consolidating the districts.

It should be noted that nothing in this court's May 1 Order either required or contemplated the construction of new schools. The magnet programs use existing facilities in the various districts; generally operate on a part-time basis; and have their curricula established and planned by the school authorities. Consequently, the Sixth Circuit's concerns regarding magnet programs are not in conflict with this court's remedial plan.

■ In addition, the State contends that the Court of Appeals' reference to the Michigan Constitution regarding the SBE's duty to plan and provide equal education for all school children precludes any remedy against the State which is not authorized by state law. Specifically, and contrary to the May 1 Order, the State contends that state school aid for transfer students may only be given to a transfer student's district of attendance. *See* M.C.L.A. § 388.1606.

As a preliminary matter, I again note that the Sixth Circuit's specific affirmance of the interdistrict transfer aspect of the May 1 Order conclusively disposes of the State's argument. Additionally, it was the State defendants' "planning," found to be unconstitutional, that brought them before this court. More importantly, the mere existence of state laws intended to protect a state citizen does not preclude that citizen from seeking relief under federal law; nor does it insulate those entrusted with the enforcement of state laws from the dictates of the United States Constitution when they choose to violate state laws. *See generally Monroe v. Pape,* 365 U.S. 167, 81 S.Ct.

473, 5 L.Ed.2d 492 (1961); *see also Cohens v. Virginia,* 19 U.S. (6 Wheat) 264, 5 L.Ed. 257 (1821). In view of the fact that the State defendants have been found to have purposely and intentionally violated both the United States and the Michigan Constitutions, *see* 467 F.Supp. 630, I find the State's arguments to be patently disingenious. *See Milliken v. Bradley,* 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977). For the above reasons, the State's motion to vacate is denied.

## II. TRANSPORTATION COSTS

■ On October 28, 1982, this court ordered that Coloma Community Schools and Eau Claire School District submit desegregation transportation costs to defendant Intermediate School District to determine the amount of transportation costs directly attributable to this court's May 1, 1981 Order. The audit by the Intermediate School District has established the following costs were incurred by the districts as a direct result of this court's May 1 Order:

| | |
|---|---|
| Coloma Community Schools: | $ 8,295.40 |
| Eau Claire School District: | $21,081.22 |

Although these costs are directly attributable to this court's May 1 Order, the Intermediate School District audit reveals that the court's transportation plan, as implemented by the Eau Claire School District, has not been run with total efficiency. Consequently, pursuant to the recommendation of the court's transportation expert, I find that the Eau Claire transportation bill should be reduced by ten percent. This reduction results in an adjusted figure of $18,973.09.

■ In accordance with this court's October 28, 1982, Order, the State of Michigan shall pay to the respective districts, sixty-six and two-thirds percent (66⅔%) of the above costs. These sums are as follows:

| | |
|---|---|
| Coloma Community Schools: | $ 5,524.74 |
| Eau Claire School District: | $12,636.08 |

IT IS SO ORDERED.

## III. TRANSPORTATION PLAN

■ On January 18, 1983, this court ordered that the defendants develop a transportation plan to effectively implement this court's May 1 Order. To date, no plan has been formulated or submitted to the court. Now, therefore, in accordance with this court's January 18, 1983, Order, the districts are hereby directed to prepare a transportation plan in concert with the Michigan Department of Education, for review by the court prior to the 1983–1984 school year.

Specifically, the districts are to complete the preparation of the plan no later than July 15, 1983. Minimally, the plan shall contain proposed routes, daily mileage and proposed budgets. During the preparation period, one or more meetings between the districts and the Michigan Department of Education shall be scheduled by the Berrien Intermediate School District, which is hereby directed to provide coordination for the plan.

The court's transportation expert, Herbert Norder, shall provide whatever assistance and guidance may be needed for completion of the plan.

Upon completion, the plan shall be submitted to the Superintendents of the three school districts for their review. Additional copies of the plan shall be submitted to Dr. Michael Stolee and Dr. Philip O'Leary for their review and approval. Any recommendations and changes resulting from this review may be incorporated into the final plan. Submission of the final plan to the transportation supervisors shall occur no later than August 15, 1983.

Subsequent to the beginning of the 1983–1984 school year, an audit shall be performed following the "Fourth Friday Count." Deviations of more than five percent from the estimated daily mileage will be subject to the same review procedure as outlined above and accompanied by an explanation by a transportation supervisor as to the cause of the deviation. The results of this procedure shall be used by this court in further determinations of transportation cost allocation.

IT IS SO ORDERED.

## IV. MAGNET SCHOOL COMMITTEE

■ In the May 1 Order, this court ordered that a Magnet School Committee be established. At that time, I directed that funds be made available to plan the magnet schools in an amount not to exceed $50,000 per year for the period from the date of the May 1 Order through the 1982–1983 school year. The court's special master, Dr. Michael Stolee, has informed the court that, although the Committee's work is not yet concluded, it has been greatly reduced. Consequently, the funds needed to complete magnet school planning have also been reduced. Additionally, Dr. Stolee has recommended that the Magnet School Committee need not continue independent of the Superintendents Council inasmuch as the function of the two committees to a large degree overlap. Upon the recommendation of the court's special master and consistent with the advice of the members of the Magnet School Committee, the May 1, 1981, Order shall be altered as follows:

1. The Superintendents Council shall consist of its present membership with the addition of a representative of the State Board of Education.

2. The Magnet School Committee shall be discontinued at the end of the 1982–1983 school year, and its duties assumed by the Superintendents Council.

3. The Superintendents Council shall meet at least once each two months, and more often if needed.

4. For each year until further notice, the sum of $7,500 shall be made available to the Superintendents Council for the purpose of planning, implementing, improving, and evaluating magnet school programs only.

5. The Berrien County Intermediate School District shall serve as the custodian of these funds, disbursing them on the authorization of the Intermediate School District Board following the recommendation of the Superintendents Council.

6. Of the $7,500, the State of Michigan shall pay 50% ($3,750); the Benton Harbor Area School District shall pay 25% ($1,875); the Coloma Community Schools shall pay 12% ($900); the Eau Claire Public Schools shall pay 8% ($600); and the Berrien County Intermediate School District shall pay 5% ($375).

IT IS SO ORDERED.

## V. WAYNE STATE COMPUTER COSTS

■ Prior to the time that this case was transferred to my court, Judge Fox ordered that the remedy called for in this case required the assistance of professional transportation experts. Judge Fox ordered that an account be established at Wayne State University in Detroit, Michigan, to establish a transportation plan for the Benton Harbor area. Consistent with that Order, this court has continued to rely on the facilities and staff of Wayne State University. Although the participation of Wayne State University has been crucial to the efficient implementation of the May 1 remedy, for reasons unknown to me, Wayne State University failed to submit bills for the costs of its services for more than a year after it became involved in the desegregation program. This court's audit of Wayne State's cumulative bills reveals a number of inaccuracies and some double billings. This does not diminish the crucial role played by Wayne State in the success of the instant desegregation program, but simply reflects the University's difficulty in attempting to invoice costs incurred over a two-year period. This court is also laboring under these difficulties. Nevertheless, the court's special master's investigation of the total amount incurred by Wayne State University shall be completed within ninety (90) days. Within that time an order shall be issued setting forth the total amount to be paid by the parties. That amount shall be apportioned in the following manner: State of Michigan, 50%; Benton Harbor Area School District, 25%; Coloma Schools, 12%;

Eau Claire Schools, 8%; Berrien County Intermediate School District, 5%.

IT IS SO ORDERED.