**Mona BRONSON, et al., Plaintiffs,**

v.

**BOARD OF EDUCATION OF the CITY SCHOOL DISTRICT OF the CITY OF CINCINNATI, et al., Defendants.**

**Charles R. BEATY, II, Plaintiff,**

v.

**BOARD OF EDUCATION OF the CINCINNATI PUBLIC SCHOOLS, Defendant.**

**Nos. C–1–74–205, C–1–82–1545.**

United States District Court, S.D. Ohio, W.D.

Jan. 10, 1984.

---

See also, D.C. 573 F.Supp. 759, 767.

Thomas I. Atkins, Reginald C. Govan, NAACP Special Contribution Fund, Brooklyn, N.Y., Trudy D. Rauh, Cincinnati, Ohio, for Bronson, plaintiffs.

Robert W. Blackmore, Cincinnati, Ohio, for plaintiff Beaty.

John A. Lloyd, Jr., Sally Conley Lux, Glen Weissenberger, Cincinnati, Ohio, for defendant City of Cincinnati School Dist.

A. David Nichols, Metzger, Phillips & Nichols Co., LPA, Cincinnati, Ohio, Mark O'Neill, Weston, Hurd, Fallon, Paisley & Howley, Cleveland, Ohio, for State of Ohio; Special Counsel to Attorney General, State of Ohio; represents State Bd. of Educ.

James W. Farrell, Jr., Mark A. Vander Laan, Dinsmore, Shohl, Coates & Deupree, Cincinnati, Ohio, for defendants Deer Park City School Dist., Madeira City School Dist., Mariemont City School Dist., North College Hill City School Dist., Norwood City School Dist., St. Bernard-Elmwood Place City School Dist., Reading Community City School Dist.

Bruce I. Petrie, Sr., John B. Pinney, Graydon, Head & Ritchey, Cincinnati, Ohio, for defendant Indian Hill Exempted Village School Dist.

George E. Roberts, III, Ennis & Roberts, Cincinnati, Ohio, for defendant Lockland City School Dist.

Michael E. Maundrell, Rendigs, Fry, Kiely & Dennis, Cincinnati, Ohio, for defendant Princeton City School Dist.

Lawrence McTurnan, McTurnan & Meyer, Indianapolis, Ind., for defendants Finneytown Local School Dist., Forest Hills Local School Dist., Northwest Local School Dist., Three Rivers Local School Dist., Hamilton County School Dist.

John C. Elam, Suzanne K. Richards, Vorys, Sater, Seymour & Pease, Columbus, Ohio, for defendant Wyoming City School Dist.

James W. Harper, Cincinnati, Ohio, for defendant Oak Hills Local City School Dist.

Arnold Morelli, Bauer, Morelli & Heyd, Cincinnati, Ohio, for defendant Green-Hills Forest Park City School Dist.

William E. Santen, William B. Singer, Santen, Santen & Hughes Co., LPA, Cincinnati, Ohio, for defendant Sycamore City School Dist.

ENTRY SETTING FORTH DETAILED REASONING BEHIND DECISIONS AND ENTRIES OF DECEMBER 19, 1983, SUSTAINING MOTIONS FOR SUMMARY JUDGMENT FILED BY SUBURBAN SCHOOL DISTRICT DEFENDANTS AND THE HAMILTON COUNTY BOARD OF EDUCATION DEFENDANTS

RICE, District Judge.

On December 19, 1983, the Court filed seven separate Decisions and Entries

wherein the Court sustained the motions for summary judgment filed by the various suburban school district Defendants [1] and the Hamilton County Board of Education Defendants.[2] At a conference, held on that same date, the Court informed the parties of its rulings and indicated that a subsequent entry, wherein the Court consolidated its response to those Defendants' motions, would be forthcoming. This entry, therefore, serves the purpose of drawing together into a single opinion the various reasons why the Court found these Defendants' motions to be well taken.

## I. The Issues Vis-a-Vis the Suburban Defendants

At the outset, the Court must stress that the instant proceeding, though properly grouped within the generic category of school desegregation cases, is not what could be viewed as a typical or traditional case of that nature. The distinctive nature of the instant proceeding stems from three

basic realities, or facts, which have imposed considerable constraints upon the breadth of the issues the Plaintiffs herein may properly raise against the various named Defendants.

The first limiting factor is that this is not the first school desegregation case to be brought seeking an order to desegregate the school system in the City of Cincinnati. On November 11, 1963, a class action was filed against the Cincinnati Board of Education on behalf of "Negro minors within the school district of Cincinnati ...." The ensuing *Deal v. Cincinnati Board of Education* litigation [3] resulted in a finding that the Cincinnati Defendants had not, prior to July 26, 1965, the date of the rendering of the initial opinion in *Deal*, acted with segregative intent in bringing about the racial imbalance in the Cincinnati school system. Having failed to demonstrate that the distribution of black and white students within the Cincinnati schools was the result of

1. The following Suburban school district Defendants' motions for summary judgment were sustained in the Entries filed on December 19, 1983: Indian Hill Exempted Village School District, Deer Park City School District, Madeira City School District, North College Hill City School District, Norwood City School District, Reading City School District, St. Bernard Elmwood Place City School District, Wyoming City School District, Sycamore Community School District, Finneytown Local School District, Northwest Local School District, Three Rivers Local School District, Forest Hill Local School District, Lockland City School District, Greenhills-Forest Park City School District. One Suburban district, the Oak Hills Defendants, did not file a motion for summary judgment along with these Defendants and was not, therefore, considered in any of the December 19th Entries. Upon this Court's sustaining all of the other Suburban Defendants' motions, however, Plaintiffs consented to the late filing of a comparable motion by Oak Hills and agreed to respond to said motion within a sufficiently brief period of time that the Court could rule on Oak Hills' motion prior to the scheduled January 10, 1984, trial date.

2. Throughout this Entry, as well as those filed on December 19th, the Court refers to the Defendants filing summary judgment motions as the "Suburban Defendants." Moreover, the facts presented and arguments raised by the parties concerning these motions are discussed in terms of their implications with respect to the

"Suburban Defendants" or "Suburban districts." Though the Hamilton County Board of Education is a somewhat different entity than the remaining Defendants considered within these entries, the reasoning and conclusions reached by the Court with respect to the Suburban Defendants are equally applicable to the Hamilton County Board of Education. Though the Hamilton County Board does not itself operate any schools, it does provide support services to five local school districts located in Hamilton County: Finneytown, Forest Hills, Northwest Local, Three Rivers, and Southwest (which has never been a Defendant herein). As the Hamilton County Board has never had jurisdiction and/or control over the Cincinnati School District, its liability, if any, in this action must rest upon actions it has taken in one or more or all of the districts just listed. Thus, facts and arguments raised concerning each of these districts likewise extend to the Hamilton County Board of Education because of the shared role the County Board plays along with the various local Boards in providing services and thus impacting upon the educational systems and programs within these districts.

3. *Deal v. Cincinnati Board of Education*, 244 F.Supp. 572 (S.D.Ohio 1965), *aff'd*, 369 F.2d 55 (6th Cir.1966), *cert. denied*, 389 U.S. 847, 88 S.Ct. 39, 19 L.Ed.2d 114 (1967) (*Deal I*); *Deal v. Cincinnati Board of Education*, 419 F.2d 1387 (6th Cir.1969), *cert. denied*, 402 U.S. 962, 91 S.Ct. 1630, 29 L.Ed.2d 128 (1971) (*Deal II*).

any intentionally segregative conduct by the Cincinnati Defendants, Plaintiffs were denied the desegregative relief they sought. *Deal I*, 244 F.Supp. at 582.

Subsequently, the complaint in the instant proceeding was filed, not only against the Cincinnati Board of Education but also against the State Board of Education, the Hamilton County Board of Education, and the Suburban School Districts within Hamilton County. The filing of the instant action led to a series of decisions [4] wherein the collateral estoppel effect of the prior rulings in *Deal I* and *II* on the scope of the issues capable of litigation herein was determined. As a result of these decisions, a sizable chunk of the *Bronson* Plaintiffs' action was carved away, leaving what could be described as a gaping hole in the case they sought to prosecute. Foreclosed from litigation in the present proceeding, because of *Deal I* and *II* as explained by the Sixth Circuit in *Bronson I* and *II*, is the question of whether the Cincinnati Defendants "did prior to July 26, 1965, act with segregative intent or that the actions, inactions or policies of the [Cincinnati] Board prior to that date violated the constitutional rights of minority pupils or their parents. These issues have been decided and under the issue preclusion application of collateral estoppel may not be reopened." *Bronson I*, 525 F.2d at 349; *Bronson II*, 687 F.2d at 843.

As a result, to the extent Plaintiffs seek to prove that the present racial distribution in the Cincinnati schools is the result of intentionally segregative actions and/or inactions taken *prior* to July 26, 1965, Plaintiffs are placed in the position of having to make their case against the State and/or Suburban and/or Hamilton County Defendants, because they are foreclosed from relitigating whether the actions or inactions of the *Cincinnati* Defendants *prior* to that date were constitutionally violative. Moreover, in attempting to establish the liability of any one or more or all of the non-Cincin-

nati Defendants for the pre-July 26, 1965 conditions in Cincinnati, Plaintiffs cannot pursue a theory of liability against these Defendants that asserts that any one or more or all of them acted in concert with the Cincinnati Defendants in intentionally creating the racial imbalance in the Cincinnati schools prior to July 26, 1965, or that any one or more or all of the non-Cincinnati Defendants failed to take action or to counteract the segregative activity of the Cincinnati Defendants prior to July 26, 1965. Clearly, as the Cincinnati Defendants' conduct has been judicially determined to be free of segregative intent prior to that date, no other Defendants' liability can be premised upon a theory that presumes or presupposes the contrary.

■ The second fact which imposes a significant limitation of Plaintiffs' cause of action herein is the composition of the Plaintiffs' class as certified. The only Plaintiffs currently named as parties in the present action are certain named students (and their parents) who were attending schools in the *Cincinnati* school system when this suit was filed. When Judge Porter certified the class that these Defendants could represent, he found

Plaintiffs herein represent a class consisting of all students presently attending or who will attend schools in the public school system of the City of Cincinnati and the parents of such children.

*Opinion Re Class Certification*, July 18, 1978 (Porter, J.). Plaintiffs have never sought the joinder of additional named plaintiffs from other school districts throughout Hamilton County, nor have they filed a motion seeking recertification of an expanded plaintiff class. Thus, from the beginning of this action to the present time, the Plaintiffs have only represented the interests of the students and parents residing within the boundaries of the Cincinnati school system and have not, there-

---

4. *Bronson v. Board of Education of the City School District of the City of Cincinnati*, 525 F.2d 344 (6th Cir.1975), *cert. denied*, 425 U.S. 934, 96 S.Ct. 1665, 48 L.Ed.2d 175 (1976) (*Bronson I*);

*Bronson v. Board of Education of the City School District of the City of Cincinnati*, 687 F.2d 836 (6th Cir.1982) (*Bronson II*).

fore, had standing or the legal right to complain of any segregated conditions that may exist solely within one or more or all of the suburban school districts. Any constitutional violation for which the Plaintiffs seek redress must have had, at a minimum, a segregative effect on the schools within the Cincinnati school system, and thus upon the Plaintiffs themselves, or these Plaintiffs would lack the requisite standing to complain and to seek redress for such segregated condition or conditions. (Decision and Entry Granting Plaintiffs' Motion for Leave to File an Amended Trial Complaint, filed August 2, 1983, at 16–21, Doc. # 589; Entry Clarifying Trial Issues, filed Oct. 21, 1983 at 2–3, Doc. # 649). 573 F.Supp. 767.

■ Finally, to the extent any of the Plaintiffs' allegations leveled at the named Defendants originally sought to impose liability on any one or more or all of them for the independent segregative conduct of housing officials and/or other non-joined government or private agencies and/or actors, the Sixth Circuit's decision in *Bell v. Board of Education,* 683 F.2d 963 (6th Cir.1982), clarified that school officials could *not* be held liable for remedying the *independent* constitutionally violative conduct of such other entities. Thus, Plaintiffs are put to the task of demonstrating that there was or is some nexus between the actions or inactions of these other actors and agencies not made parties to the instant proceeding and the named Defendants representing the interests of the Cincinnati school district, the State, the Suburban school districts, and the Hamilton County Board of Education. Absent the showing of such a nexus, the conduct of other entities not named as Defendants in the instant proceeding would simply have no relevance to the issues properly triable herein.

In addition to the three factors just discussed which limit the overall scope of these Plaintiffs' action and serve to distinguish this case from other school desegregation cases, there is a fourth constraint upon Plaintiffs' cause of action against the Suburban Defendants which stems from the decisional law concerning the conditions under which separate and autonomous school districts, such as these Suburban districts, may be required to participate in a multi-district school desegregation remedy. As explained by the Supreme Court in *Milliken v. Bradley,* "the notion that school district lines may be casually ignored or treated as a mere administrative convenience is contrary to the history of public education in our country. No single tradition in public education is more deeply rooted than local control over the operation of schools ...." *Milliken v. Bradley,* 418 U.S. 717, 741, 94 S.Ct. 3112, 3125, 41 L.Ed.2d 1069 (1974). The parties do not dispute the fact that the school districts named as Defendants in this action are, as were the school districts under consideration in *Milliken,* separate and autonomous entities enjoying local control over the activities within their respective school districts. Review of the Ohio statutory provisions creating and defining the responsibilities of local school districts in Ohio (*see, e.g.,* Ohio Rev.Code Chapters 3311, 3313, 3315, 3317, 3319 & 3329) leads inescapably to the conclusion that the state intended to create, and in fact did create, independent locally controlled entities responsible for the education of the students within their boundaries. The Supreme Court in *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 281, 97 S.Ct. 568, 573, 50 L.Ed.2d 471 (1977), in examining the status of local boards of education and political subdivisions in Ohio noted that "a local school board such as petitioner is more like a county or city than it is like an arm of the State."

■ It is because Ohio's local school districts are in fact separate and autonomous entities comparable in their level of independence and in the extent of their local control to the school districts considered by the Court in *Milliken,* that this Court must adhere to the guidelines announced in *Milliken* for determining whether a multi-district remedy would be appropriate herein. As explained by the Supreme Court in *Milliken v. Bradley:*

The controlling principle consistently expounded in our holdings is that the scope of the remedy is determined by the nature and extent of the constitutional violation. *Swann* [*v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, at 16, 91 S.Ct. 1267, at 1276, 28 L.Ed.2d 554 (1971)]. Before the boundaries of separate and autonomous school districts may be set aside by consolidating the separate units for remedial purposes or by imposing a cross-district remedy, *it must first be shown that there has been a constitutional violation within one district that produces a significant segregative effect in another district. Specifically, it must be shown that racially discriminatory acts of the state or local school districts, or of a single school district have been a substantial cause of interdistrict segregation.* Thus an interdistrict remedy might be in order where the racially discriminatory acts of one or more school districts caused racial segregation in an adjacent district, or where district lines have been deliberately drawn on the basis of race. In such circumstances an interdistrict remedy would be appropriate to eliminate the interdistrict segregation *directly caused* by the constitutional violation. Conversely, without an interdistrict violation and interdistrict effect, there is no constitutional wrong calling for an interdistrict remedy.

*Milliken v. Bradley*, 418 U.S. 717 at 744–5, 94 S.Ct. 3112 at 3127, 41 L.Ed.2d 1069 (1974) (emphasis added). *See also, Berry v. School District of the City of Benton Harbor*, 698 F.2d 813, 817–819 (6th Cir. 1983).

 As explained by the Fifth Circuit in *Lee v. Lee County Board of Education*, 639 F.2d 1243, 1254–55 (5th Cir.1981):

*Swann* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554] made clear that the mere existence of a predominantly one-race school did not violate the fourteenth amendment. *Milliken* made clear that

the mere existence of a one-race school district did not violate the Constitution.

❖ * ❖ * ❖ *

It seems important to note also that *Milliken*, unlike *Swann* and *Keyes v. School Dist. No. 1*, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973), did not sanction the use of any presumptions on the question of the cause of interdistrict segregation. Thus while *Swann*, as noted above, permits an inference that the continued existence of one-race schools in a system that formerly practiced de jure segregation is a vestige of such segregation, and *Keyes* permits one to infer the existence of systemwide de jure segregation from proof that school authorities have pursued an intentional policy of segregation in a substantial portion of a school district, *Milliken refused to sanction a presumption that significant disparities in the racial composition of autonomous school districts resulted from impermissible action by those districts and thus justified imposing upon them the burden of remedying conditions of segregation existing in other districts.* The *Milliken* Court noted that both *Keyes* and *Swann* merely involved "the use of a significant racial imbalance in schools within an autonomous school district as a signal which operates to shift the burden of proof [which] is a very different matter from equating racial imbalance with a constitutional violation calling for a remedy." 418 U.S. at 741 n. 19, 94 S.Ct. at 3125 n. 19.

The lesson of *Milliken*, as further explained by the Supreme Court in *Hills v. Gautreaux*, 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976), is that before a separate and autonomous school district may be required to join in an interdistrict remedy, there must be proof that there has been a constitutional violation by that district, of either an inter- or intra-district nature, which has produced *significant, substantial and direct interdistrict segregative effects.* Alternatively, a district may be brought into an interdistrict remedy if it can be shown that another district (or the

state) has engaged in conduct violative of the Constitution which has had a significant interdistrict segregative effect that includes the particular school district sought to be made a part of the remedial plan. *Id.* at 292–306, 96 S.Ct. at 1543–1550. Thus, before district lines of separate and autonomous school districts may be overridden by the remedial powers of a court, there must be both a finding of *conduct* violative of the Constitution *and* a finding of a significant interdistrict segregative *effect*. Though it is not necessary that *each* Defendant brought into an interdistrict remedy be found *both* to have engaged in the constitutionally violative *conduct* having an interdistrict effect *and* to have been a part of the interdistrict segregative *effect* which results from that conduct, at the very least, *each* district brought into a multidistrict remedy must be found either to have engaged in intentionally segregative conduct *or* to have suffered a *significant, substantial* and *direct* segregative effect because of some other Defendants' violative conduct. Moreover, the clear import of *Milliken* is that racial imbalance *alone* among or within otherwise autonomous school districts neither constitutes a violation of the Constitution nor gives rise to a presumption that the school districts have engaged in constitutionally violative conduct. Thus, Plaintiffs seeking a multi-district remedy cannot rely on the mere fact that some school districts may be essentially white and some may be essentially black as a basis for overriding otherwise autonomous district lines. Rather, Plaintiffs are put to the task of garnering specific proof of intentionally segregative actions or inactions which have had a clear and significant interdistrict effect. As explained by the Fifth Circuit in *Lee v. Lee County Board of Education:*

We believe the (Milliken) court's deliberate choice of phrases such as "substantial" or "direct cause" and "significant

segregative effects" also expresses an insistence that in cases where an interdistrict remedy is requested, *there must be clear proof of cause and effect and a careful delineation of the extent of the effect.* In the absence of such a showing, school district lines are to be carefully observed and desegregation remedies confined to orders affecting the school district in which the condition of segregation is manifest.

639 F.2d at 1256.

▪ In further analyzing the interdistrict remedy cases [5] that had been decided since *Milliken,* the Fifth Circuit went on to conclude that the interdistrict segregative practices and/or policies upon which an interdistrict remedy is sought to be based must have a *current and continuing,* significant, substantial and direct segregative effect before interdistrict relief may properly be ordered. Past actions or inactions which may arguably have been motivated by segregative intent, but for which there are no lingering substantial and significant interdistrict segregative effects, are simply of no relevance in shaping a multi-district remedy. Thus, to the extent Plaintiffs seek to draw any or all of the Suburban Defendants into a multi-district remedy on the basis of their having engaged in alleged segregative conduct, Plaintiffs must present proof of a nexus between the alleged violative past or present conduct of that particular Suburban district and the *current* racial imbalance in the Cincinnati school system.

▪ When all of the limiting factors just discussed (i.e., those stemming from the history of and distinct nature of the instant proceeding and those stemming from the relevant decisional law) are brought to bear on Plaintiffs' cause of action, the issues remaining which Plaintiffs may properly attempt to litigate against the Suburban Defendants are quite narrow. The only

5. *Newburg Area Council, Inc. v. Board of Education of Jefferson County, Kentucky,* 510 F.2d 1358 (6th Cir.1974), *cert. denied,* 421 U.S. 931, 95 S.Ct. 1658, 44 L.Ed.2d 88 (1975); *Armour v. Nix,* Case No. 16708, N.D. Georgia, *aff'd,* 446 U.S. 930, 100 S.Ct. 2146, 64 L.Ed.2d 784 (1980); *Evans v. Buchanan,* 393 F.Supp. 428 (D.Dc. 1955), *aff'd without opinion,* 423 U.S. 963, 96 S.Ct. 381, 46 L.Ed.2d 293 (1975).

remaining triable issues involved with *each* Suburban Defendant are as follows:

(1) Has the Suburban district under consideration engaged in intentionally segregative conduct[6] which has had a significant, substantial, direct and current and continuing interdistrict segregative effect which, at a minimum, includes the Cincinnati school system;[7] and/or

(2) Has there been a constitutional violation committed by any one or more of the other Defendants named in this action which has had a significant, substantial, direct and current interdistrict segregative effect which includes the Suburban district under consideration as well as the Cincinnati School System.[8]

## II. *Procedural Posture*

Over the rather protracted period of time since the filing of the original complaint in this matter, the various Defendants and this Court have repeatedly endeavored to extract from Plaintiffs a trial complaint, as well as specifications of charges, wherein the Plaintiffs would demonstrate an understanding of the various constraints discussed above on their cause of action and which would set forth in comprehensible clarity the bases upon which Plaintiffs intended to establish the liability of any or all of the Defendants and/or the bases upon which Plaintiffs intended to draw the various Defendants into any remedial plan that they felt should be forthcoming in this action. Unfortunately, the efforts that have been forthcoming from Plaintiffs have in many respects left not only the parties, but also the Court, at somewhat of a loss as to the true substance of Plaintiffs' claims herein.

The final chapter in what has evolved into the prolonged and frustrating process of trying to bring Plaintiffs' cause of action into focus was this Court's Decision and Entry filed on August 2, 1983, wherein the Court sustained Plaintiffs' motion to file an amended trial complaint *in conformity with the parameters and limits discussed within that entry.* The amended trial complaint subsequently filed responded only to a limited degree to the Court's guidelines and directives and thus necessitated this Court's filing a subsequent entry (Entry Clarifying Triable Issues, filed October 21, 1983, Doc. # 649) 573 F.Supp. 767, which was intended to clarify issues properly triable in this matter, notwithstanding Plaintiffs' apparent continued attempts to introduce issues that far exceeded the scope of the constraints discussed in the preceding section of this Entry.

Shortly after the filing of Plaintiffs' Amended Trial Complaint and this Court's Entry of October 21, 1983, the motions for summary judgment of the various Suburban Defendants and the Hamilton County Defendants were filed. In support of their respective motions for summary judgment, the Defendants have all submitted various forms of factual materials (affidavits, admissions, answers to interrogatories and/or excerpts from the deposition testimony taken from Plaintiffs' witnesses) to demonstrate that as to the relevant issues in this case, no genuine issues of material fact exists and that they are each entitled to judgment in their favor as a matter of law.

---

**6.** Though the intentionally segregative conduct which is alleged to have been committed by a Suburban district may consist of inaction in certain instances, no Suburban district may be found liable for failing to have acted or failing to have otherwise responded to the allegedly intentionally segregative conduct by the Cincinnati Defendants prior to July 26, 1965. *Deal I* and *II* and *Bronson I* and *II* preclude any finding which is premised upon or requires a preliminary finding that the Cincinnati Defendants acted with segregative intent prior to the rendering of the decision in *Deal I.*

**7.** Because Plaintiffs only have standing to complain of actions or inactions having an effect within the Cincinnati school system, Plaintiffs may not seek to impose liability upon the Suburban Defendants (or *any* Defendants, for that matter) for actions or inactions which are alleged to have had a segregative effect felt only in one or more or all of the *Suburban* districts.

**8.** *See, discussion, note 7, supra.*

These Defendants have exhaustively reviewed the factual record and the applicable law to demonstrate that, based upon the facts and the law, as this Court must apply it, the Plaintiffs have failed to demonstrate any legitimate basis upon which these Defendants can be required to remain in the present action.

The motions of the Suburban Defendants and the Hamilton County Defendants are, then, all properly supported by Fed.R. Civ.P. 56(c) materials and thus have served to trigger Plaintiffs' burden as required by Fed.R.Civ.P. 56(e) which states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth *specific facts* showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

(emphasis added). In order to withstand these Defendants motions for summary judgment, Plaintiffs were thus put to the task of presenting *facts*, by way of "depositions, answers to interrogatories and admissions on file" demonstrating the existence of a genuine issue of *material fact.*[9] Instead, Plaintiffs have responded to these Defendants' motions in four ways:

(1) By making references to the deposition testimony of their expert witness, Dr. Gordon Foster, which testi-

mony either does not create a genuine issue of *material* fact *or* creates issues of fact with *no legal significance* within the narrowly drawn issues in this case pursuant to the prevailing Supreme Court and Sixth Circuit case law;

(2) By making reference to their unverified revised trial complaint which is not a proper Rule 56(c) material for demonstrating the existence of a genuine issue of material fact;

(3) By making references to their specification of charges against individual Suburban districts, which, being unverified and without references to any interrogatories, requests for admissions, or other factual material, have no more force and effect than unverified pleadings;

(4) By making representations to the Court that a trial upon the merits will elicit any and all specific facts concerning the Suburban Defendants which may presently be lacking from the record.

In addition to the inadequacy of the supporting materials Plaintiffs have submitted in an effort to withstand these Defendants' motions, Plaintiffs have also attempted to argue that these materials tend towards establishing the liability of the Suburban Defendants upon various postulated theories of liability which are either not legally valid or to the extent any of the theories might be valid, the asserted bases for liabil-

---

**9.** The Court notes that the Plaintiffs approach with respect to the Greenhills Forest Park Defendants' motion for summary judgment was somewhat different than that taken with the remaining Suburban Defendants. The Greenhills Forest Park motion was filed prior to the Sixth Circuit's decision in *Bronson II* and *Bell* and prior to this Court's August 2, 1983 and October 21, 1983, Entries, all of which have had a substantially narrowing impact on Plaintiffs' asserted cause of action and ostensible theories of liability. At the time Plaintiffs responded to the Greenhills Forest Park Defendants, their focus appeared to be on identifying what Plaintiffs felt were actions taken by these Defendants which would serve to support an inference of segregative intent. Though reference should be

made to the December 19, 1983, Entry sustaining Greenhills Forest Park's motion for summary judgment for the specific allegations made and inadequacies of same, suffice it to say that the major flaw in Plaintiffs' case against these Defendants was their failure to present one iota of evidence which demonstrated that anything these Defendants had done or were doing was having any segregative effect whatsoever in Cincinnati. Nonetheless, to the extent Plaintiffs likewise intended to attempt to impose liability on the Greenhills Forest Park Defendants on the basis of any of the purported theories of liability discussed by the Court herein, the Court finds its reasons for rejecting these theories of liability to be equally applicable to the Greenhills Forest Park Defendants.

ity are without factual support.[10] Plaintiffs theories for relief, which appear to be several fold, are as follows:

## (1) *The "Urge To Merge" Theory.*

Under this theory of liability, Plaintiffs would impose upon the Suburban districts a post-*Brown* affirmative duty to self-destruct by merging with, or annexing themselves to, the Cincinnati school system to achieve a greater racial balance within the Cincinnati schools. Thus, if an essentially white Suburban district, rather than merging with Cincinnati, chose instead to build a new facility to meet the needs of the students residing within that Suburban district, then, according to Plaintiffs, that district engaged in conduct violative of the Constitution.[11]

**10.** Certain excerpts from the deposition testimony of Plaintiffs' expert witness, Dr. Gordon Foster, serve to shed illuminating light on the nature of Plaintiffs' asserted case against the Suburban Defendants.

Q. Okay. Do you know of any specific action taken by any suburban school district which has been intended to contain black children in the CPS [Cincinnati Public Schools]?
A. (Witness did not answer immediately.) On this point I do not, no.
Q. Do you know of any action taken by any suburban school district which has been intended to exclude black children from those districts?
(Colloquy between counsel excluded).
A. –Uh—only to the extent that nobody was receptive to Lincoln Heights at the time a home was trying to be found for those children.
Q. But ultimately Princeton did accept Lincoln Heights as of 1970?
A. Right.

. . . . .

A. This wasn't a specific exclusion—it was just like there was no welcoming of Lincoln Heights, that's all.
Foster deposition at 1557–58.

**11.** In discussing the Reading School District, for example, Dr. Foster stated:

... the very act, in my opinion, of having the act of school construction, either being the new schools, or additions, post-Brown, in a racially disparate district metropolitan-wise, bears a burden of proof that it is not connected to the racial separatism that existed at any given time during this period in the total metropolitan area. And if you are in a predominantly white or racially identifiable white district, and are building buildings, then you are part of that pattern.
(Foster deposition, at 1416–7).
Q. But there is nothing that the School Board did, particularly with respect to its building program, for instance, to keep blacks from moving in and attending these schools; correct?
A. Nothing, specifically, I would believe, no.
Similarly, with respect to the Indian Hill School District:

Q. What is the basis for your assertion that the opening of the Wyandotte School, for example, had a segregative effect?
A. The basis for that assertion is that the opening of any school virtually all white or all white in the metropolitan area since Brown contributes to the pattern of separation of the races in education.
(Foster deposition, at 1290).
Q. What are the alternatives that a board has to view to build such schools that would satisfy your position?
A. One alternative might be to become part of a metropolitan district so that the schools can be opened up in a desegregative manner.
Q. Is that the only alternative you would give it?
A. Another one would be to redistrict in such fashion that you have access to blacks and whites rather than totally white situation.
Q. You would redistrict; by that you mean you would change your shape?
A. I would be talking at that point about the possibility of consolidating with the districts that were slightly different in their racial makeup.
Q. And which districts would those be in the Indian Hill case?
A. Well, any ones that were in Hamilton County that were significantly black on the context of the metropolitan area. There aren't too many. In 1978 this would have included Greenhills, Lockland, North College Hill, Princeton, basically.
Q. So that the Indian Hill Board might have proposed consolidation with any one of those districts?
A. Well, you have to have a contiguous district, I think so, couldn't be with any one of those districts, because none of those districts are contiguous with Indian Hill, so it would have to be a little larger than that. If you talk about—are you simply asking how would Indian Hill do it any differently? I say that one possibility would be to have a countywide district, which has been proposed historically now as one possibility.
Q. That's what I understood you to say. But you suggested there might be a consolidation of a part of the countywide district. What would it be?
A. Well, the only way you could alter the racial makeup would be to move far enough

■ By attempting to advance this theory of liability, Plaintiffs appear to be casually ignoring clear Supreme Court direction that absent a preliminary finding of a constitutional violation, school officials have *no* duty or obligation to integrate. Moreover, it is clear beyond question that racial imbalance alone does not establish segregative intent. *Washington v. Davis,* 426 U.S. 229, 240, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976) ("That there are both predominantly black and predominantly white schools in a community is not alone violative of the Equal Protection Clause. The essential element of *de jure* segregation is a 'current condition of segregation resulting from intentional state action,'" quoting, *Keyes v. School Dist. No. 1,* 413 U.S. 189, 205, 93 S.Ct. 2686, 2696, 37 L.Ed.2d 548 (1973)); *Milliken v. Bradley,* 418 U.S. at 744–45, 94 S.Ct. at 3127 ("Before the boundaries of separate and autonomous school districts may be set aside ... it must first be shown that there has been a *constitutional violation* within one district that produces a significant segregative effect in another district.") Thus, as noted by the Sixth Circuit in *Davis v. School District of City of Pontiac, Inc.,* 443 F.2d 573, 575 (6th Cir.), *cert. denied,* 404 U.S. 913, 92 S.Ct. 233, 30 L.Ed.2d 186 (1971):

> A school district has no affirmative obligation to achieve a balance of the races in the schools when the existing imbalance is not attributable to school policies or practices and is the result of housing patterns and other forces over which the school administration had no control.

out so that you would incorporate into the district a district that had a significant amount of black pupils.
Q. I am asking you if there is such a district available.
A. If you mean contiguous, my answer is no.
Q. So that the option of consolidation with a contiguous district is simply not available to the Indian Hill Board; is that correct?
A. Not to a contiguous district, no. Well, I will have to retract that; Cincinnati does happen to be contiguous to Indian Hill.
Q. It does touch Indian Hill at one small point?
A. Yes.

Clearly then, if a Suburban school district cannot be shown to have acted with segregative intent in *creating* the racial imbalance in the Cincinnati school system, then that suburban district cannot be said to have been under an affirmative obligation to rectify any existing racial imbalance by attempting to merge with or annex itself to the Cincinnati school district.

■ There is absolutely no evidence that any school built within a Suburban school district was built for any reason other than to provide facilities for the youth within that district and for whom the respective school boards and administrations have and had a statutory duty to educate. The meeting of the needs of the students within a Suburban district, even if that district is essentially white, quite simply is not, in and of itself, conduct violative of the Constitution. As discussed by the Sixth Circuit

> As a matter of general principle, assigning school children to schools in their neighborhoods does not offend the Constitution. Racial imbalance in the schools does not, in itself, establish a constitutional violation. The Constitution imposes no duty on school officials to correct segregative conditions resulting from factors over which they have no control, such as residential patterns, and the failure to anticipate the effect on racial composition of the schools of adherence to a neighborhood school policy does not signify that a school board has created a dual system, absent a showing of segregative intent.

Q. So that Indian Hill might consolidate with the City of Cincinnati, is that what you are suggesting?
A. That would change the factor you asked about, yes.
Q. You regard that as a realistic opportunity?
A. No.
(Foster deposition, pp. 1292–94).
Q. Do you have any evidence, reason to believe that the Cincinnati School District desired to annex any of the various suburban districts that are involved in this case?
A. I am not prepared to state that at this moment.
(Foster deposition, p. 1311).

*N.A.A.C.P. v. Lansing Board of Education,* 559 F.2d 1042, 1049 (6th Cir.), *cert. denied,* 434 U.S. 997, 98 S.Ct. 635, 54 L.Ed.2d 491 (1977) (citations omitted). *See also, Higgins v. Board of Education of the City of Grand Rapids,* 508 F.2d 779 (6th Cir.1974), and *Deal v. Cincinnati Board of Education,* 244 F.Supp. 572 (S.D.Ohio 1965), *aff'd* 369 F.2d 55 (6th Cir.1966), *cert. denied,* 389 U.S. 847, 88 S.Ct. 39, 19 L.Ed.2d 114 (1967) [*Deal I* ].

### (2) The Racial Containment Theory

Under the "racial containment" theory, Plaintiffs postulate that the Suburban Defendants, as well as the other named Defendants, either singularly or collectively, are somehow responsible for containing blacks within the City of Cincinnati. *How* they are supposed to have accomplished this feat is not clear.[12] In part, it appears that Plaintiffs are suggesting, as a factual underpinning for this theory, the fact that Cincinnati is predominantly black and the majority of the Suburban districts are predominantly white. The Court, evidently, is expected to draw the inference from the fact of this racial disparity, that the Suburban Defendants must have caused it to come about. Plaintiffs fail, however, to identify any specific acts of the Suburban districts upon which this Court could draw

the inference that the Suburban Defendants have done anything with the intent of confining blacks to the City of Cincinnati. There is no evidence of some grand design involving any or all of the Suburban Defendants, or even evidence of an individual Suburban Defendant having acted to contain blacks within Cincinnati. Racial imbalance, alone, however, is not, as discussed above, violative of the Constitution.

Plaintiff's racial containment theory also rests upon allegations concerning the acts of other government and private actors and agencies who Plaintiffs allege have contributed to shaping the residential patterns and, it is argued, the distribution of races within Hamilton County. Even, assuming arguendo, that Plaintiffs were able to garner the requisite proof to establish that other actors and/or agencies not named as Defendants herein caused or contributed to the unbalanced distribution of black and white residents within Hamilton County, Plaintiffs have failed to suggest even the slightest factual basis upon which this Court could infer that any one or more of the Suburban Defendants, or *any* of the named Defendants, for that matter, in any way acted in concert with these unnamed parties.[13] It is well settled that absent a

---

**12.** The speculative nature of this theory postulated by Plaintiffs is evidenced in Dr. Foster's discussion of the Sycamore district:

> To the extent Sycamore was perceived and maintained as a white enclave, blacks from Cincinnati and other areas in which they lived would have been dissuaded from moving in, their children would have been effectively kept out of the district, and CPS and other areas in which blacks were then resident would have been even more greatly impacted with black residents and students. Sycamore superintendents, and board members would have been key actors, as would have been the local officials who failed to encourage construction of housing for low income families, state officials who refused or failed to complain or take action concerning Sycamore policies and who provided funds with which the segregation could be reinforced or maintained, and federal housing officials who failed to initiate legal actions to protect against denials of federal civil rights. We are here dealing, except for the White Oak assignment and the Maplewood reassignment (sic),

with culpable default in the face of a duty to act, rather than specific actions.

**13.** The complete failure of Plaintiffs' witnesses to demonstrate the requisite nexus between these Defendants' actions and those of other non-named parties is reflected in the following excerpts from the deposition testimony of Plaintiffs' witnesses. Dr. Karl E. Taeuber, Professor of Sociology at the University of Wisconsin and Dr. Martin Sloane, General Counsel for the National Committee Against Discrimination in Housing:

> Q. Now, with any of these items you have mentioned, where school desegregation has had an effect on residential character of an area of the city, have you made any study as to Cincinnati or Hamilton County.
> A. (Witness did not answer immediately.) No; the study that I have made on the topic is limited to ascertaining that school segregation and residential segregation separately continue in Hamilton County, but I have not made any specific study of their connection in this locale.

showing of a nexus between the conduct of any of the named Defendants and the acts of housing authorities or other government or private actors or agencies responsible for shaping the residential patterns in their districts and/or Hamilton county, these named Defendants herein *cannot* be held liable for, or be responsible for remedying, any racial imbalance that may be attributed to the practices and policies of these independent actors and agencies. *Bell v. Board of Education*, 683 F.2d 963 (6th Cir.1982); *Deal v. Cincinnati Board of Education*, 369 F.2d 55, 61 (6th Cir.), *cert. denied*, 389 U.S. 847, 88 S.Ct. 39, 19 L.Ed.2d 114 (1967) ("there is no constitutional duty on the part of the Board to bus Negro or white children out of their neighborhoods or to transfer classes for the sole purpose of alleviating racial imbalance that it did not cause, nor is there a like duty to select new school sites solely in furtherance of such a purpose.")

This second theory of Plaintiffs' founders, therefore, because Plaintiffs have failed to provide the Court with any factual basis upon which the Court could *properly* infer that any one or more of the Suburban Defendants acted with segregative intent to contain blacks within Cincinnati. Moreover, Plaintiffs have failed to demonstrate

(Taeuber deposition, at 165).

When asked whether he intended to analyze the policies or practices of any school board with respect to segregation in housing, Sloane responded:

A. ... ultimately decide whether to accept or reject a proposal for assisted housing. School boards in no way control the ultimate decision. Dr. Irvine offered no testimony that any of the municipalities involved were in any way influenced by the action or inaction of the pertinent school board.

Q. Have you been asked to try to determine to what extent, if any, the policies and practices of any of the school districts that are parties to this case may have contributed to segregation in housing?

A. No.

Q. Do you expect to do that?

A. No.

(Sloane deposition, at 24).

**14.** *See,* note 12, *supra.* Further testimony of Dr. Foster with respect to the Sycamore Defendants reveals the lack of factual basis for Plaintiffs' Community Perception Theory:

or to present any evidence indicating that the conduct of the Suburban Defendants, individually or collectively, has had any segregative effect at all, to say nothing of a significant, substantial, direct and current segregative effect, on the Cincinnati School System.

### (3) *The Community Perception Theory*

■ Closely tied to the containment theory is Plaintiffs' "community perception" theory for imposing liability on the Suburban Defendants. This theory asserts that the collective whole of the actions taken or not taken by a given Suburban school district has created the public perception that the Suburban district is a white enclave in which blacks are not welcome and into which they ought not to have the temerity to move. Apparently, these Suburban white enclaves have enticed and are continuing to entice whites to leave the Cincinnati School System and have discouraged similar migration by blacks. Once again, however, Plaintiffs have failed to present any evidence that anyone, other than Dr. Foster, does in fact so perceive the Suburban districts or the Suburbans' actions or failures to act or that anyone has acted on the basis of such a perception by either moving or failing to move.[14] Plaintiffs' expert on

A. ... the interdistrict effect that I tried to explain previously in relation to Lockland would be the pattern that was developed in the metropolitan area, and Sycamore was simply a part of that pattern.

\* \* \* \* \* \*

A. In maintaining an all black school prior to Brown and for four years after, I think Sycamore became part of that metropolitan pattern, and clearly indicated that in the Sycamore district blacks were to be treated separately at that level, and I think that that likely had the effect in terms of the Sycamore geographic relationship with the City of Cincinnati and the fact that it, except for Hazelwood, which is a pretty minor part of the present Sycamore area, it is a small settlement over on Cornell Road there, somewhat over there, that basically Sycamore was a white district and still is today, and interdistrict activity that went on before Brown and shortly after Brown, in my opinion, would have tended to maintain that so-called whiteness in relation to Cincinnati, still, in terms of education and real estate practices and all

this theory of liability repeatedly conceded throughout his deposition testimony that he had never conducted any surveys to assess whether in fact such a perception of the suburbs existed in Hamilton County or whether anyone who in fact perceived any or all of the suburbs to be white enclaves acted or failed to act in accordance with the theory postulated by Plaintiffs. Plaintiffs would thus have the Court consider a theory of liability and retain the Suburban districts as Defendants herein based upon nothing more than the speculation of Plaintiffs' expert witness, Dr. Foster. Speculation, however, is not the setting forth of specific facts as required by Fed.R.Civ.P. 56(e), and does *not* serve to create a genuine issue of *material fact* nor serve to withstand the properly documented motions for summary judgment filed by the Suburban Defendants.

### (4) *The Violative Employment Practices Theory*

A fourth theory of liability which Plaintiffs urge as a basis for keeping the Suburban Defendants in this action asserts that because a Suburban district has a low percentage of black faculty members, and/or school administrators, then, even though Plaintiffs have proffered *no* evidence of discriminatory hiring or promotion practices, the inference should arise, nonetheless, not only that such district has committed a constitutional violation, but also that this purported violation with respect to its employment practices has had an interdistrict segregative effect in the Cincinnati school system.[15] Assuming, *arguendo*,

---

this, what that says to me is that Sycamore and districts similar to Sycamore are operating basically like Anderson, as an example, and operating basically white districts, and if you have whites in the City of Cincinnati, from Brown to the present, you are opting to get away from a school district that's heavily black, or from Princeton, for example, which is an area closer to Sycamore, you feel Princeton is getting blacker pretty quickly, and they are looking for a white haven for schools and housing, and I think Sycamore has established that to that extent that's what they are.
Q. Is that your answer, then?
A. Yes.
Q. Let me just ask, first of all, about the last part. You say that you perceive Sycamore as a white haven for people who are moving away. On what do you base that? Do you know people, have you found people who have specifically moved to Sycamore to escape blacks in their neighborhoods?
A. All I am saying is there is a reciprocal situation between the suburban districts and the City, and if you look at Sycamore and its relationship to the metropolitan area, and particularly the City, given its racial history, I would consider it an area that would be a white haven for whites who want to get out of any kind of racial situation in Cincinnati.
(Foster deposition, Volume VIII, pp. 1016–1018).

Q. Dr. Foster, have you done anything, any survey of any kind, to back up what you are just asserting in your last few answers?
A. No, no.
Q. You don't have any data regarding the perception of the citizens of Hamilton County regarding the Sycamore School District; is that right?
A. That's right.
(Foster deposition, Volume VIII, p. 1020).

15. Dr. Foster's discussion concerning the Indian Hill faculty is typical of the discussions that took place concerning the other Suburban Defendants' hiring practices:
Q. Now, what will your testimony be with respect to the racial composition of Indian Hill staff?
A. My testimony will be that in my opinion the faculty at Indian Hill is significantly underemployed in black teachers.
(Foster deposition, p. 1270).
Q. Well, you regard it as racially segregative to simply have a program of making applications and opportunities available to anyone regardless of their race or color, and to process those applications in a perfectly racial neutral way?
A. If that's all you did in your present situation, yes, I'd say that you are certainly not making an affirmative move to employ blacks.
Q. Well, I didn't ask whether it was an affirmative move. I asked whether it was segregative to have a racially neutral program for receiving applications, screening applications, upon whatever test and standard.
A. No.
(Foster deposition, p. 1278).
Q. You know of any specific incident or of any specific practice or policy of Indian Hill that would deviate from that practice?
A. I don't know what the policy is, so I don't know.
Q. And I take it that you really know nothing specific about the Indian Hill faculty hiring

that statistical disparities may support a prima facie case of *employment* discrimination in an action brought by a teacher or administrator under Title VII, this Court is not herein investigating whether a teacher or school administrator has been subjected to discriminatory employment practices. As noted by the Sixth Circuit in *Oliver v. Kalamazoo Board of Education*, 706 F.2d 757, 762 (6th Cir.1983):

> In most desegregation cases, as in this one, the constitutional rights to be vindicated are those of the *students*, not of the teachers or potential teachers. The students do not have a constitutional right to attend a school with a teaching staff of any particular racial composition [citation omitted]. Rather with respect to the teaching staff, all that students are entitled to is a "sustained good faith effort to recruit minority faculty members so as to remedy the effects of any past discriminatory practice." [citation omitted].

██ Were there some evidence that the hiring practices of the suburbs had a segregative effect on the schools within Cincinnati, then these practices would be of some relevance to the issues in this case. To keep a Suburban Defendant in this action based on this theory, as presented by Plaintiffs, however, would require this Court to engage in speculation unsupported by any facts in the record and to draw an inference that the asserted racial imbalance in the employment statistics of a Suburban district is the result of intentionally segregative conduct with respect to the *students* which is having a segregative effect in the Cincinnati schools. Such reasoning has no basis in fact or in logic and simply cannot serve as a basis for withstanding Defendants' properly documented motions for summary judgment.

(5) *The Equal Displacement Theory*

██ Under this theory of liability, Plaintiffs assert that if something was done wrong in one portion of Hamilton County, then it *must* have had an effect within the Cincinnati school district, the logic being, if you put your finger in one side of a bowl filled with water, the other side rises. As Dr. Foster testified "anything that happens in one district affects all districts." (Foster deposition, Vol. XII, p. 1582). Even assuming the validity of this sort of ripple effect theory as an abstract proposition, it is still incumbent upon Plaintiffs to demonstrate not only facts upon which this Court could infer that a particular Suburban district acted with segregative intent or motive, but also that such action had a significant interdistrict segregative effect which included the Cincinnati school system. There simply is nothing in the record which would support the making of *both* essential inferences.

III. *The Inescapable Conclusion*

The inadequacies of the theories and ostensible "factual" issues raised by the

process other than the numbers that you have looked at and you testified to?
A. That's basically right.
(Foster deposition, p. 1280).
Q. Perhaps I have asked this before, Doctor. You don't know of any black applicant who has been denied employment in Indian Hill?
A. No.
(Foster deposition, pp. 1284–85).
So too does the following exchange reflect the substance of this theory:
Q. Do you know anything about any suburban school district with respect to any efforts made by such district with reference to the recruitment of black faculty since 1968?
A. I can't remember seeing any information or data to that effect one way or another.
Q. And I take it the same holds true with respect to the suburban school districts in terms of specific instances of discriminatory activity in terms of hiring faculty; do you know of any specific instance where any suburban school district has engaged in a discriminatory act; is that correct? [sic]
A. Well, there may be some; I don't know of any.
Q. You are not prepared to testify about any such act; correct?
A. No. I am prepared to testify about the shortage of black employment in school districts, which I will.
Q. I understand that.
A. But no specific fact.
Q. That's in terms of numbers, based on data that is simply available to you?
A. That's right.
Q. It is not based on anything other than those numbers?
A. That's correct.
(Foster deposition, at 1195–1196).

Plaintiffs in an effort to withstand these Defendants' motions are accentuated when comparison is made to the theories and factual underpinnings which have in other cases been found adequate to support imposition of an interdistrict remedy. For example, in *Newburg Area Council, Inc. v. Board of Education of Lucasville*, 510 F.2d 1358 (6th Cir.1974), *cert. denied*, 421 U.S. 931, 95 S.Ct. 1658, 44 L.Ed.2d 88 (1975), the Sixth Circuit found an interdistrict remedy appropriate because Kentucky had historically operated *de jure* segregated schools, only a very limited number of districts would be involved (two or three), in Kentucky the county was the basic educational unit (as opposed to autonomous local districts) and a state statute had recognized that school district lines were artificially drawn. *Id.* at 1359–60. Moreover, there were clearly identifiable interdistrict segregative acts such as the transporting of black students *out* of the district having no black schools and *into* a district that did have black schools.

An interdistrict remedy was also deemed appropriate in *Evans v. Buchanan*, 393 F.Supp. 428 (D.Del.1975), *aff'd without opinion*, 423 U.S. 963, 96 S.Ct. 381, 46 L.Ed.2d 293 (1975), wherein the schools within the county were not autonomous, as they are in Ohio and in Hamilton County, and they had been mandatorily segregated prior to *Brown*, a fact absent from the instant proceeding. Moreover, in *Evans*, there was an action by the state legislature in 1968 which was found by the Court to have been intentionally segregative. No comparable state legislative action is asserted in the present action.

State legislation having clear interdistrict segregative effect was viewed as constitutionally violative in the series of cases addressing the Indianapolis schools. *See, United States v. Board of School Commissioners*, 637 F.2d 1101 (7th Cir.1980), *cert. denied*, 449 U.S. 838, 101 S.Ct. 115, 66 L.Ed.2d 45 (1980). So too did action by the state legislature having a multi-district segregative effect serve as the basis for an interdistrict remedy in *Hoots v. Commonwealth of Pennsylvania*, 672 F.2d 1107 (3rd Cir.1982), *cert. denied*, 459 U.S. 824, 103 S.Ct. 55, 74 L.Ed.2d 60 (1982).

In the instant action, there is no post-*Brown* legislative action having a multi-district impact which could even possibly serve as a basis for inferring segregative intent or motive. There is no evidence of districts ignoring their boundary lines, of transferring black students out of white school districts and into black districts or evidence of the Suburban districts engaging in any sort of activity inconsistent with their responsibilities as separate and autonomous local school districts engaged in the work of educating the students within their care. To the extent any of the allegations with respect to any of the Suburban Defendants might give rise to an inference that they have engaged in conduct within their school districts violative of the Constitution, there is absolutely no basis from which the inference could be drawn that this conduct has had *any* interdistrict impact or effect. There is then, no evidence of a causal link between anything that has happened in a particular Suburban district and the current racial distribution in the Cincinnati school system. Moreover, there is no evidence that the State and/or Cincinnati and/or Hamilton County Defendants have engaged in violative conduct which has had any interdistrict segregative effect involving any one or more or all of the Suburban Defendants. Thus, the Court could only keep these Defendants in the present action if it were to engage in unsubstantiated speculation or to proceed on the basis that something might turn up at trial which might implicate these Defendants. Clearly, neither of these bases are sufficient to withstand these properly documented motions for summary judgment.

▮ Though the Court recognizes that summary judgment should be rarely granted in complex constitutional law cases such as this, the Court cannot in good conscience and in accord with the law as it must be applied, allow Plaintiffs to proceed to trial against these Defendants in the absence of their having demonstrated any basis upon

which this Court could conclude that any of these Defendants might be liable or might be properly made a party to any remedy that may eventually be deemed appropriate. Therefore, based upon the authorities and reasons set forth above and in its Entries of December 19, 1983, as well as in the memoranda submitted by the various Suburban Defendants, the Court must sustain these Defendants' motions.